ROGERS v. MORAN TOWING & TRANSPORTATION CO. et al.

Circuit Court of Appeals, Second Circuit.
July 5, 1927.

No. 343.

1. Shipping ⬅58(2⅜)—One chartering scow, which was damaged, has burden to prove that damage was done by one renting scow, who was not bailee.

In libel for damage to dump scow chartered to respondent, in which one who rented it was impleaded, original respondent had burden to show that impleaded respondent had caused damage, where no damage was shown during only time that renter could have held as bailee.

2. Shipping ⬅58(2⅜)—Evidence held insufficient to show that negligence of renter loading scow caused it to capsize in storm day later.

Evidence held insufficient to show that negligence of one renting scow from respondent, who had chartered it from libelant, caused damage to scow, which capsized in storm a day after being loaded by renter.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Robert Rogers against the Moran Towing & Transportation Company, in which the Foundation Company was impleaded as a respondent. From a decree for the libelant, placing primary responsibility on the Foundation Company, it appeals. Decree modified, with directions.

This is an appeal from a final decree in admiralty of the District Court for the Eastern District of New York, holding the appellant, the Foundation Company, primarily, and the appellee Moran Towing & Transportation Company secondarily, liable for $6,750, damages to the dump scow R. R. No. 15.

Rogers, the owner of the scow, filed a libel against the Moran Company, which had chartered the vessel. The charter from the libelant to Moran provided that the scow was to be returned "in the same condition received, less ordinary wear and tear," and the libel alleged that the scow was redelivered to the owner by the Moran Company in damaged condition, which was not due to ordinary wear and tear. The Moran Company filed an answer to the libel, and also a petition under the fifty-sixth admiralty rule, bringing in the Foundation Company, to which the scow had been rented, and alleged that the latter so negligently loaded her as to break the planking in one of the pockets. The Foundation Company denied any negligence on its part, and also denied that any damage occurred while it had anything to do with the scow.

The Foundation Company had a written contract with the Moran Company for the disposal of excavated material by loading the same at Pier 47, North River, on scows which the Moran Company agreed to furnish, shift, operate, care for, tow to sea, and there dump.

The contract provided:

"The work to be done by the Foundation Company under this agreement shall be limited to the loading of the material into scows alongside their dock at Pier 47 North River, New York City. * * *

"The liability and responsibility of the Foundation Company for the equipment rented from the subcontractor shall be limited to scows and to the interval of time during which each of said scows is held alongside dock to receive its load.

"The subcontractor shall employ and maintain at all times upon each scow a competent captain, whose duty shall include the supervision of the loading and dumping of the scows and the protection and operation of its dumping and closing machinery."

The scow in question was a wooden dump scow having six pockets with a pair of doors at the bottom of each. The scow was kept afloat by an air chamber or pontoon around the pockets, which contained the material loaded and dumped. The scow was loaded by the use of a "skip" or "pan," into which the excavated material was deposited from trucks. This pan, when filled with the material, was lowered into the pockets of the scow by a derrick set up on the bulkhead of Pier 47 and operated by a hoisting engine. The theory of the Moran Company is that the operator of the engine was negligent in lowering the pan, which ordinarily contained about nine tons of excavated material, and dropped it so far that the heavy iron pan struck the side of pocket No. 2 and broke the planks inwardly. The pan was 11 feet long by 9 feet wide, and had three sides about 2 feet high; the forward end being thus left open, from which the excavated material might slide off into the pocket of the scow that was being loaded.

The Foundation Company maintained six large arc lights and several small electric lights, so fixed that they lighted up the scow and the pan when loading was conducted at night. By this means the engineer who was lowering the pan could see some distance down into the pockets when he was depositing the excavated material. This material was sand and clay and contained no large rocks.

The scow began to load at Pier 47, North River, at 12:30 a. m. on January 15, 1924, and the loading was completed at 11:30 a. m. on the same day. She was then taken off by the Moran Company, and the tug N. Moran towed her to Pier 41. At 8:20 a. m., on January 16, the Moran tug Pan-American towed her to sea. When she got off Sandy Hook she began to list, and the tugmaster turned back, whereupon she capsized in a southeast gale and dumped her load. This the tugmaster testified was at 11:30 a. m. on January 16. He towed her back, bottom up, to Gowanus creek, arriving there after dark, when he landed her in a place where there were about 20 feet of water. Six days after, she was placed in dry dock and a survey held, which disclosed that six planks were broken inward in pocket No. 2.

The scowmaster was not called as a witness. Witnesses were called showing that the scow was tight and had no planks broken at the time she began to load. The District Judge found that the damages were due to a negligent lowering of the loaded pan, and accordingly held the Foundation Company primarily liable.

Berg, who represented the Moran Company from the beginning of the loading until the next morning, testified that he ob-

served no striking of the pan against the sides of the pocket. Hansen, who followed Berg as representative of the Moran Company, was not called. The two night and day superintendents of the Foundation Company and the two engineers who operated the loading tackle insisted that the pan never was improperly lowered, and no witness ever claimed to see or hear of any injury done by the pan.

The Moran tugmaster Kearse, who towed the scow to Sandy Hook, was confirmed by no witness in his story as to the time when the scow capsized; no one else gave any testimony as to her return to Gowanus creek, and no one at all gave any account of her between her landing there and the time she was taken to dry dock six days later. There was no contradiction of the testimony of Gargan, the dock superintendent of the Foundation Company, who was on the pier for four hours before the loading was completed, that Hansen, the representative of the Moran Company, made no complaint to him at that time. There was no evidence that other scows had had their pockets injured by the dropping of steel pans while being loaded. It appeared that the other scow in tow of the tug did not capsize.

The Weather Bureau showed a maximum wind of 40 miles between 11 and 12 on January 16, when Kearse said the scow capsized; but between 12 and 1 the wind rose to a maximum of 52 miles, and between 1 and 2 to 54 miles. Such a gale from the southeast was quite sufficient to cause a tug to turn back and a mud scow to capsize off Sandy Hook. Just the time when the scow capsized was dependent on the recollection of Kearse. It might well have been a couple of hours later than he judged.

Rumsey & Morgan, of New York City (Mark W. Maclay and John Tilney Carpenter, both of New York City, of counsel), for appellant.

Macklin, Brown, Lenahan & Speer, of New York City (Pierre M. Brown, of New York City, of counsel), for respondent appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). [1] This is a pure question of fact and the inferences to be drawn from the circumstances are not perfectly clear. It must be borne in mind, however, that the burden is upon those claiming a liability where, as here, there was no bailment by the Moran Company to the Foundation Company, and no agreement by the latter to return the scow in good order.

The contract between the Moran Company and the Foundation Company provided that the Moran Company furnish:

"The Work.—(a) The furnishing of all the necessary bottom dump and deck scows at the Foundation Company's dock, Pier 47, North River, for the disposal of excavated materials.

"(b) The operation, care, and maintenance of scows.

"(c) The towing, turning, and shifting of scows.

"(d) The disposal at sea or elsewhere of excavated materials in said scows."

Under such conditions the scow was not in the exclusive possession of the Foundation Company, and there was no duty on the part of the Foundation Company, as in the case of a bailee, to account for her condition. North Atlantic Dredging Co. v. McAllister (C. C. A.) 202 F. 181. But even if, for the limited time that the scow was being loaded at Pier 47, the Foundation Company was in the position of a bailee, the latter adduced proof that nothing happened to her injury, and left the Moran Company to show on the whole case that the Foundation Company was guilty of negligence. C. F. Harms v. Turner Construction Co. (C. C. A.) 3 F.(2d) 591; The Monongahela (C. C. A.) 282 F. 17; The Junior (C. C. A.) 279 F. 407; Hildebrandt v. Flower Lighterage Co. (D. C.) 277 F. 436, affirmed (C. C. A.) 277 F. 438.

[2] We think the evidence of negligence was insufficient. No one saw the scow struck by the steel pan. The master was not called as a witness. The superintendent, Hansen, who was to care for the last part of the loading on behalf of the Moran Company, was not called. There was not only a gale which might bring the pocket very violently against any obstacle which it encountered on the way in to Gowanus creek, but after it reached there the wind rose to 69 miles at 7:15 p. m. on January 16. It is impossible to tell whether such a gale did not drive the pocket into old spiles, a sunken wreck, or jagged rocks, or to surmise what might have occurred to it during six days, the first of which was passed in a violent storm. Moreover, it is not easy to see how a blow which stove in the planks of this scow as far as six inches, if made by the steel pan, would have left her tight enough to float almost a day, and then to proceed out to Sandy Hook in a high wind, without capsizing long before she did.

The views of Capt. Bagger, a surveyor of

reliability and reputation, tended to support the conclusion of the court below as to the cause of the accident. Nevertheless he admitted that there might have been other causes than contact with the pan, and the extraordinary fact remains that no one but the Moran tugmaster was called to recount the capsizing of the scow, or tell about her return trip from Sandy Hook or her landing at Gowanus creek, and no one at all was called to show what happened to her from the time she was landed until she was taken to the dry dock on the sixth day after.

It is true that the dock superintendents of the Foundation Company were most of the time in an office of that company on Pier 47, and might not have seen or heard of an injury by the pan, if it took place, and that the engineers who operated the hoisting engine were not disinterested witnesses; but the testimony of these four men, though subject to some criticism, was confirmed by Berg, who represented the Moran Company, and was met by no witness to the contrary. The failure of the Moran Company to make prompt complaint and to call material witnesses seems significant. In spite of the deference due the findings of the trial judge, we regard his solution of the accident as too speculative to be justified by the evidence.

In view of the fact that the parties have stipulated that, if the decision below be modified, so as to place the primary liability upon the Moran Towing & Transportation Company, a decree shall be rendered in favor of the Foundation Company against the Moran Company for restitution of damages paid by the former to libelant, the decree is modified, and the District Court is directed to enter a decree in favor of the Foundation Company against the Moran Towing & Transportation Company for $6,750, with interest from January 30, 1926, together with costs.