## THE SEABOARD NO. 58.

### SEABOARD SAND & GRAVEL CORPORATION v. AMERICAN STEVEDORES, Inc.

District Court, E. D. New York.

April 23, 1945.

Foley & Martin, of New York City (James A. Martin and Christopher E. Heckman, both of New York City, of counsel), for libelant.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant's scow Seaboard No. 58 was chartered to the respondent on March 21, 1944, when it was delivered in good order and condition alongside the S. S. Para which lay on the northerly side of pier 22, Brooklyn, bow out, to receive a cargo of sand and slag being discharged therefrom by the respondent; the operation proceeded on that and the two following days, and was completed about 1 p. m. on March 23d, when the scow was removed from the ship's side to a temporary berth, and later to a dock in the Bronx River, where discharge was had, and on March 27th she was returned to libelant.

While so under charter to the respondent, the scow developed a twist, namely, the starboard bow corner and the port stern corner were each down about one foot and the port bow corner and the starboard stern corner were each about one foot above horizontal, and it is necessary to determine whether that condition resulted from the negligent conduct by the respondent in the loading of the scow, as the libelant alleges.

The evidence is confined to the manner in which that was done, which excludes any question of negligence in the conduct of the later discharge of that cargo from the scow.

The evidence yields the following:

### Findings

(1) Ownership and incorporation are found to be as alleged in the pleadings.

(2) The scow Seaboard No. 58 is built of wood, and her dimensions are 117 feet by 36 feet by 10 feet draft, and she has a 4-foot rail.

(3) The scow was in good order and condition when delivery was made to the respondent on March 21, 1944, as charterer.

(4) The scow was placed alongside of hatches 1 and 2 on the starboard side of the S. S. Para which was lying bow out on the northerly side of pier 22, Brooklyn, on March 21, 1944, on which day discharge of a cargo of sand and slag from the steamer to the scow was begun by the respondent, at about 8 a. m. The loading proceeded as follows:

|  | Hatch No. 1 | Hatch No. 2 |
|---|---|---|
| March 21 | 8 – 12; 1 – 7 | 2 – 5 |
| March 22 | 8 – 12; 1 – 8 | 8 – 12; 1 – 8 |
| March 23 | 7 – 1 | |

(5) The ship's outboard booms at each of these hatches, which carried the lowering tackle, were too short by 4 feet to permit of emptying the buckets employed in the operation, at the center fore and aft line of the scow, so that the peak of each load, so dumped, was about 4 feet laterally from said center line.

(6) The capacity of the said buckets was a half ton, and as each was lowered to the deck of the scow it was opened and turned over, and the contents fell to the deck between the center of the scow and its side which was nearest the ship. Two men were stationed on the deck of the scow to shovel the sand and slag toward the center. Nine or ten tons per hour were dumped on the scow from each hatch while the loading was being done.

(7) At intervals of time determined by the respondent, the scow was moved along the ship's side, so that four piles were thus formed fore and aft, and when the scow was listed toward the ship as the result of this process, she was removed from the side of the ship and turned around by a tug, to resume receiving the contents of the buckets, but on the then high side, so that trim might be effected.

(8) The scow was thus turned once during each of the three days on which the discharge proceeded.

(9) In general, the scow was trimmed slightly to the stern, in order that the pumps might function as needed.

(10) Before the discharge was completed on March 23d, the libelant protested orally to the respondent, that the discharge was not being properly conducted; namely, a telephone message to that effect was delivered by the libelant's Assistant Marine Superintendent, Bird, to Gans, the comptroller of the respondent.

(11) The total tonnage of sand and slag so laden by the respondent on the Seaboard No. 58' was not clearly stated, but was estimated at between 450 and 500 tons, which was well within the carrying capacity of the said scow.

(12) No damage was suffered by the said scow while under charter to the respondent, after her loading had been completed and prior to the survey on April 5, 1944.

(13) A twist developed on the Seaboard No. 58 during the said loading, and by the time it had been completed, the starboard bow corner and the port stern corner were each one foot below the horizontal, and the

port bow corner and the starboard stern corner were each one foot above the horizontal.

Manifestly the foregoing present the single question of whether the respondent has met the prima facie case of the libelant, based upon the failure to return the scow Seaboard No. 58 in good order and condition, etc., by showing that, as bailee, it was not negligent in loading the cargo of sand and slag into the scow.

The respondent argues that no twist was proved; if one was, then it must have been the result of unseaworthiness. The latter contention deserves scant consideration, because the only surveyor called was Schaumberg who represented respondent at the survey of April 5, 1944. He stated that he then observed the twist as stated in Finding No. 13, and that it could have been caused either by stranding, improper loading, capsizing, or by age condition, i. e., the softening of timbers. Since he said he observed no such condition as the latter at the survey, and there was no stranding or capsizing, it results that the only remaining possible cause, improper loading, is the sole subject of inquiry.

Such was the understanding of both court and counsel at the end of the hearing, as the record shows, and respondent's later argument to the contrary will be attributed to its discovery of Bartley v. Borough Development Co., D.C., 214 F. 296, which is factually quite remote from this case.

■ That a stevedore who fails to conduct such a loading operation from ship to scow or lighter with due regard for the physical requirements and effects of the operation may be held liable, was decided in: The Robert R, 2 Cir., 255 F. 37; The Adah, 2 Cir., 258 F. 377; The Randwyk, 4 Cir., 226 F. 724.

The respondent relies upon the testimony of Cassarine, a winchman, Rubio, a foreman of stevedores, Nick Alotta, a trimmer on the scow, and his father, Antonio, also a trimmer, Sahlberg, the captain of the shifting tug, and Ponce, harbor master for the Bull Lines (the stevedores tell him when a vessel is to be moved and he tells the captain of the shifting tug, but his legal relationship to the custody of the scow is obscure) and O'Reilly, the respondent's timekeeper.

All of them said (except Antonio Alotta) that they did not see any twist in the scow after the loading had been completed, and that generally the loading proceeded in the customary way, which will be explained briefly. As to their failure to observe a twist, it is to be remembered that this scow was 117 feet long, and that a 2-foot difference between the bow and stern corners on one side would not be conspicuously apparent to a casual observer, even if he were alongside, at the scow's level and sufficiently distant to be able to make a visual comparison; and since some of these witnesses were not looking for a twist, and some had never seen one, their negative testimony is less than persuasive as to the fact.

The affirmative testimony of the scowman Meeker, and of the neutral witness Burns, in charge of the scow Rickerson, which lay at hatch No. 3 of the Para, next aft to the Seaboard No. 58, is preferred on this issue, and is accepted.

There is a conflict of testimony as to whether Meeker protested to the foreman that the loading was being done improperly, since he is contradicted by respondent's witnesses. No finding is made as to that, but I am satisfied that a telephone protest was made on March 23d by the libelant's Assistant Marine Superintendent Bird, to respondent's comptroller Gans, which was referred to in the confirmatory letter written on the 29th, and since Bird's information was not based on his own observation, Meeker was probably the one who originally reported the matter to the office of his employer, which is as indicative of his making a prompt protest as though it were undisputed that he made known his criticism to respondent's foreman.

Coming now to the method of loading, it is undisputed that the scow was made fast, bow out, on the starboard side of the S. S. Para, opposite the Nos. 1 and 2 hatches, and that the former was about 50 feet or so from the ship's bow.

There were cargo booms fixed at or near the ship's sides, which were too short by 4 feet to permit the one-half ton buckets, carrying the sand and slag, to fall in a line of descent which was approximately in the fore and aft center line of the scow.

The buckets were dumped through the release, by a man on the scow's deck, of a locking device, which permitted the bucket to be turned over and dumped. Two men were so engaged with each bucket, and when dumping had taken place, and a pile of material was about waist high, they would both shovel it toward the center of

the scow. Two hatches were worked at a time, so two piles were constantly being formed and partially leveled off as stated; at intervals the scow was moved forward by hand, so that piles could be formed in the deck spaces alongside the ship, not occupied by the contents of the buckets as first dumped, so that four piles in line were thus successively formed and partially shoveled toward the center line, causing the scow to have a low side and a high side as the work progressed.

It is important to note that the shoveling or trimming never resulted in creating the same condition of trim as would have resulted if the buckets had been dumped only in a center fore and aft line.

This necessitated turning the scow when it had listed so far as to require loading on the high side. Such a turning was made in the afternoon of March 21st; again on the following day, again in the afternoon; and finally again on the third day, probably in the late morning as work stopped at 1 p. m.

The turning was accomplished by the tug Passaic, working in that slip, which took the scow in tow alongside for that purpose.

There can be no doubt from the testimony that this method of loading was rendered necessary because of the short booms on the ship, and that it is usually done in that way, when the cargo booms are too short to admit of center fore and aft stowage.

It is reasonably to be inferred that this process exposes the hull of the scow to a series of torsional strains, and if the evidence were to the effect that the work could not have been done otherwise, perhaps the conclusion would be required that the respondent had presented sufficient proof to meet its burden of persuasion, and to demonstrate its freedom from negligence in causing this twist in the libelant's scow. It is thought that this is not the showing, however, in the absence of testimony that the buckets could not have been controlled by hand lines affixed to them, which would have caused them to be swung away from the ship, during the process of lowering, so that finally they would be in a position for dumping in approximately a fore and aft line on the scow.

Probably such a method would have entailed increased labor charges in affixing such a control line to the bucket, and in working it from or at the outboard side of the scow; probably also the speed of the operations would be reduced by the employment of such a method; but if the respondent chose to practice economy in such a matter, it seems unfair to visit the price of it upon the libelant whose vessel is found to have sustained a twist as an incident to this operation which was entirely out of its control, and exclusively in that of the respondent.

It is concluded, therefore, that the respondent has not presented sufficient proof to overcome the prima facie case of libelant, and that the latter is entitled to the usual interlocutory decree with costs.

Settle decree.