## SEABOARD SAND & GRAVEL CORPORATION v. AMERICAN STEVEDORES, Inc.

### THE SEABOARD NO. 58.

#### No. 68.

Circuit Court of Appeals, Second Circuit.
Dec. 5, 1945.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The appellee, the owner of the scow Seaboard No. 58, chartered her to the appellant to be used in the removal of sand and slag ballast from the S.S. Para which was berthed on the north side of Pier 22, Brooklyn, N. Y. She was a deck scow 117 feet long with a beam of 36 feet and drew 10 feet. On March 21, 1944, she was delivered to the charterer alongside the Para and the appellant on that day began to discharge the ballast from the Para onto the deck of the scow. The loading was continued throughout that day and the next and until about three o'clock in the afternoon of the third day when the scow was loaded with from 450 to 500 tons of slag which was well within her capacity, and then she was taken away from the ship by a tug and tied up at the pier bulkhead. Later on the same day she was towed to the Bronx River where she was unloaded by March 27, 1944, and on that day returned to the owner. She was in a damaged condition when returned, having a twist of about two feet. This suit was brought by the owner in the District Court for the Eastern District of New York to recover the damages caused by the twist. The charterer has appealed from an interlocutory decree in which it was held liable.

The evidence in the record gives adequate support to findings, some on controverted issues, made by the trial court to the following effect:

When the scow was delivered to the charterer she was in good order and condition. She was loaded by dumping the

ballast along her deck from fore to aft from buckets which discharged about one half a ton at a time. The Para's outboard booms were used to haul the loaded buckets from the ship's hold and then they were swung over the scow's deck as close to the center line of it fore and aft as the length of the booms would permit. When at that point, the release of a locking device caused the bucket to turn over and dump its load on the scow. But because of the shortness of the booms the discharged loads fell about four feet nearer the ship than the center line, fore and aft, of the scow's deck. The scow was moved by hand along the ship to aid in distributing the load more evenly fore and aft and two employees of the charterer shoveled the slag to help trim the load more evenly. The discharge from the Para was from buckets operating at two holds at a time which dumped nine or ten tons an hour in four piles. The shovelers did not trim all this material as fast as it came aboard. On each of the days during the loading the scow took a list toward the ship and was turned by a tug to permit the loads from the buckets to fall on the high side of the deck. She was at all times trimmed a little to the stern to aid in keeping her pumped. Before the loading was completed on March 23rd the assistant marine superintendent of the owner telephoned the comptroller of the charterer and protested that the scow was not being loaded properly. The record does not show that he then complained of a twist, but the trial court found that, "A twist developed on the 'Seaboard No. 58' during the said loading, and by the time it had been completed, the starboard bow corner and the port stern corner were each one foot below the horizontal, and the port bow corner and the starboard stern corner were each one foot above the horizontal."

As these findings were based on the evidence of witnesses who testified in court, which if believed was a sufficient basis for them, we accept them since it is thus made apparent that they are not clearly erroneous. Petterson Lighterage & T. Corporation v. New York Central R. Co., 2 Cir., 126 F.2d 992.

Decision on the appeal must follow determination as to whether or not the trial judge correctly applied the law to the facts proved and correctly found in reaching his conclusion that the appellant was guilty of negligence and consequently liable for the damage to the scow.

The burden to show negligence rested upon the libelant throughout the trial. That never shifted. It may have been temporarily discharged, and the prima facie case thus made out by the libelant might have been overcome by the libellee either by meeting it with evidence that merely offset it so that the trier would be unable to find a preponderance either way or by evidence which did outweigh it, though the libellee was never required to do the latter as a condition precedent to a decree in its favor. As the scales tipped one way or the other, or remained even, as the trial proceeded, either party could, of course, mend its hold as its evidence enabled it to do; but if in the end the proof did not preponderate at least to a slight extent to show negligence the libelant failed to prove a case. When a scow is bailed as this one was, in good order and condition and returned damaged, proof of that by the owner is sufficient to show for the time being that the charterer was negligent. Sometimes that is called a rebuttable presumption and it is at least an inference which the law requires the trier to draw in the absence of any other proof of what had happened to the scow and what had been done with her while she was in the possession of the charterer. When however such other proof is presented substantial enough to meet the presumption of negligence, it disappears and the libelant must then overcome proof with proof until the evidence of negligence outweighs that to the contrary. Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734; Cummings v. Pennsylvania R. Co., 2 Cir., 45 F. 2d 152; The Roslyn, 2 Cir., 93 F.2d 278; Commercial Molasses Corporation v. New York Tank B. Corporation, 2 Cir., 114 F. 2d 248.

We think it fairly appears that the trial judge applied these well established rules for the conduct of the trial and reached his legal conclusions accordingly, though it is true that some language in his opinion might perhaps be interpreted as indicating the contrary. For instance, he said in his opinion [59 F.Supp. 975, 978], "It is reasonably to be inferred that this process [the method of loading with booms 'too short to admit of center fore and aft stowage'] exposes the hull to a series of torsional strains, and if the evidence were

to the effect that the work could not have done otherwise, perhaps the conclusion would be required that the respondent has presented sufficient proof to meet its burden of persuasion, and to demonstrate its freedom from negligence in causing this twist in the libelant's scow. It is thought that this is not the showing, however, in the absence of testimony that the buckets could not have been controlled by hand lines affixed to them, which would have caused them to be swung away from the ship, during the process of lowering, so that finally they would be in a position for dumping in approximately a fore and aft line on the scow. * * *"

"It is concluded, therefore, that the respondent has not presented sufficient proof to overcome the prima facie case of libelant, and that the latter is entitled to the usual interlocutory decree with costs."

 But assuming that we are mistaken as to the rule applied by the trial judge, we would not reverse this decree for the error, if any, did not touch the evidence or the findings. Very likely he inadvertently spoke of the respondent's "burden of persuasion" as one "to demonstrate its freedom from negligence in causing the twist in the libelant's scow" and when he concluded "that the respondent has not presented sufficient proof to overcome the prima facie case of libelant" used "overcome" when he meant "meet." However that may be, we are in as good a position as he was to apply the correct legal rule to the facts found and decide the question of liability on appeal from a decree in admiralty. The Lucille, 86 U.S. 73, 19 Wall. 73, 22 L.Ed. 64; The Zev, 9 Cir., 28 F.2d 864.

The relevant facts in addition to those previously stated are undisputed and are that the scow was towed from the bulkhead to the place where she was unloaded and was unloaded and returned to the owner without incident and without being further damaged.

The expert testimony was to the effect that the twist might have been caused by the way the loading was done and though other possible causes, such as soft timbers in the scow, might have caused the twist, no such causes were proved. The evidence in the end left the manner of loading as the only reasonable way to account for the twist.

Apparently what the judge said about the failure to show that hand lines could not have been used to distribute the material more evenly directly from the buckets was prompted merely by his own theory of what might have been done. Whether or not such a use of hand lines would have been feasible is of little consequence however, since his ultimate conclusion that the respondent's negligence in loading the scow caused the damage was the correct one as our own review of the record shows.

Affirmed.