I repeat that I express no opinion as to the cogency of any of the foregoing arguments.

## DWYER LIGHTERAGE, Inc. v. CHRISTIE SCOW CORP. et al.

### THE WILLIAM J. RYAN.

#### No. A–18209.

United States District Court
E. D. New York.
April 19, 1951.

Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan, New York City, of counsel), proctors for libellant.

Reginald V. Spell, New York City (John P. Carson, New York City, of counsel), proctor for respondent.

Pyne, Lynch & Smith, New York City (Anthony V. Lynch, Jr., New York City, of counsel), proctors for respondent-impleaded.

BYERS, District Judge.

The libellant's barge William J. Ryan, being in good and seaworthy condition, was under the usual harbor charter to Christie on December 21, 1945, and was returned three days later in damaged condition not due to ordinary wear, etc., and the libellant's ensuing prima facie cause is not disputed.

It sufficiently appears that on the 22nd Christie engaged the impleaded respondent, Dauntless Towing Line, Inc., to tow this and another scow (Doris) from Pier 5, East River, Manhattan, both light, up the

North River bound for the S. S. Franka, then at anchor in the river about 1½ miles north of the George Washington Bridge. The voyage was begun at about 1:00 A.M. of the 23rd (a Sunday), both barges being alongside the tug Dauntless, the Ryan to port and the Doris to starboard. They are of about the same dimensions, which need not be stated. The make-up of the two is not criticized nor are the lines, nor the 380 h.p. of the tug.

It is not disputed that after rounding the Battery the tow proceeded on her way up the river and soon encountered an ebb tide, the strength of which was not shown but which was probably 1 to 1½ knots, which was stipulated to be the strength of a flood tide, at the stage of the proof when that was thought to be tidal movement.

The night was clear, with wind out of the northwest of a force of 33 miles per hour; the moon was showing. A mid-river course was followed and there was some floating ice near the Manhattan shore.

The tug's deckhand, Johansen, was acting as lookout on the Ryan at her bow, and all required lights on the tug and barges were showing.

When about off 35th Street, the tug's captain, Pederson, who was steering, felt a shock and knew that the tow had hit something although he did not then see the object itself. The striking was at once reported by the lookout who said that the Ryan had apparently struck what looked like a floating fender such as would be used in connection with the docking of a ship, which when seen later in the tug's searchlight proved to be barely awash.

The tug at once reversed her engines, and soon backed the tow away, and then the fender or float was clearly observed, and its estimated dimensions were about 30 feet by 6 feet; it was unpainted, carried no light, and seemed to be oil soaked.

Having backed clear, the tug then proceeded up river to about the George Washington Bridge, and by then the ice was bearing down in the ebb tide so that the tug's captain deemed it necessary to turn his tow around, and bring it down river without reaching the ship, and for no reason stated in his testimony to account for its selection, he tied both barges up at the end of the Archer Daniel's Pier, Edgewater, N. J., the Ryan next to the pier and the Doris outboard. He then returned to 35th Street, Brooklyn, where the tug was tied up, and reported to his office, but did not then mention the said striking. He did report that later after hearing that the Ryan had sunk at the Edgewater pier. He made no inspection of the Ryan before leaving her, but summoned the bargee of the Doris who did go aboard the Ryan, and helped to tie up both craft as stated.

Johansen testified that as soon as the striking took place he knocked on the door of the Ryan's cabin and called the bargee to come out and "take the boat" but the latter made no response, nor did he subsequently appear, which explains why Pederson called upon the bargee of the Doris to go aboard the Ryan and help in the tie-up operations.

There is no testimony to account for the aloofness of the Ryan's bargee, who has since died. No one is forbidden to realize that this incident occurred in the early hours of a Sunday morning.

It is conceded for the respondent-impleaded that the Ryan sank at the place where she had been moored, on the morning of December 23, 1945. A survey held five days later revealed breaks in the first and second end planks above the bottom, such as could be expected if a light barge were to strike a floating object while under way.

In spite of the failure of the tug's captain or lookout to inspect the hull of the barge when she was tied up, the inference is plain that the damage was occasioned by the incident recited, and it is so found.

The questions argued are whether the towing operation was conducted negligently so as to impose a liability upon the tug to respond for the primary liability resting upon Christie, the charterer. Before that is reached, however, there is a question of laches as asserted against the impleading petition, which requires statement:

The libel was filed after the lapse of nearly a year, on December 6, 1946, and the

answer of Christie on February 18, 1947; therein it is alleged that the damage to the Ryan "was caused solely through the fault, neglect and want of care on the part of the Dauntless Towing Line", the barge being at the time under the direction and control of the tug Dauntless. Three years, four months and thirteen days later, or on June 30, 1950, an impleading Petition under Admiralty Rule 56, 28 U.S.C.A., was filed. The fault of the tug was alleged in substantially the form stated in the Answer.

The Petition was excepted to as being untimely, namely, more than three years after the cause of action accrued, Section 49, paragraph 6, New York Civil Practice Act; then came an amended Petition containing a new allegation to the effect that, in addition to the negligence of the tug as already pleaded, it was operating under an agreement between Christie and the towing line "under the terms of which" the latter "agreed to pay and be responsible for any damage caused by said tug" and thereunder the towing line "is liable for the amount of any recovery by libellant * * *".

The exceptions were submitted September 20, 1950, and thereafter were overruled with leave to renew at the trial. The memo accompanying the decision by Judge Abruzzo states: "It is conceded that there was no written contract of indemnity or otherwise * * * but Christie bases its claim * * * upon a quasi contract growing out of an implied contractual relation between these two parties * * * (which) might be governed by Section 48 (1) of the Civil Practice Act which is a six-year statute."

At the trial, no testimony was offered by Christie save that of the tug captain and the lookout whom it called as respondent's witnesses to describe only the incidents of December 23, 1945; that is, there was no evidence tendered to sustain the post exception assertion in the amended Petition of an alleged indemnity agreement between Christie and Dauntless, yet it was to permit of the offer of appropriate evidence that the exceptions were tentatively overruled.

The result is that the 3-year statute of the New York Civil Practice Act, § 49, subd. 6, must be consulted on the subject of laches, and will be followed, in the absence of "circumstances to excuse delay". See Schiavone-Bonomo Corporation v. Buffalo Barge Towing Corporation et al., 2 Cir., 132 F.2d 766. Here the amended Petition under Rule 56 discloses the laches, whereby the respondent rested under the duty to "plead and prove facts negativing laches or tolling the statute". See Redman v. United States, 2 Cir., 176 F.2d 713 at page 715. Since there is neither pleading nor proof as required, the exceptions of Dauntless to the impleading Petition as amended are now sustained.

It is required now to consider the cause as though the tug Dauntless and its tow were alike under the dominion of Christie. The latter has argued that the tug was at fault because neither the captain nor the lookout perceived the fender although they were required to do so since there was some floating ice; as they were supposed to avoid that, the requirement for observing the fender was more acute than would be the case ordinarily, and only negligence could account for the failure of vision. Since the cause as asserted against the tug is dismissed, the argument, if it can be so dignified, does not require disposition as against the tug.

There remains, however, to consider whether, in failing to demonstrate liability for negligence on the part of the tug, Christie has incidentally shown enough to "meet" libellant's prima facie case, Seaboard Sand & Gravel Corp. v. American Stevedores, 2 Cir., 151 F.2d 846 at page 848, or to "overcome the presumption * * *", The E. T. Halloran, 2 Cir., 111 F.2d 571 at page 572, arising from the failure to return in good order and condition. Probably there is no essential difference between these two expressions in such a case against a charterer. If the latter's proof meets, i.e., offsets the prima facie case, it thereby overcomes the legal presumption indulged in to regulate the mechanics of trial procedure.

Here Christie has presented a rational explanation of how the damage was occasioned, by offering the testimony of the

tug captain and the lookout; that is its entire case; it is devoid of any showing of negligence concerning the collision, and the libellant does not argue to the contrary; it rests, however, upon the assertion that these witnesses "did not testify that the collision referred to caused any damage to the barge".

Literally that is true, but the breaking of the first and second end planks from the bottom was the natural and probable result of the impact upon a light barge drawing perhaps two feet, moving under power against such an obstacle as this fender which was awash. It seems to me that the inference is inescapable that the sinking of the barge was the result of that damage. Whether if the bargee, or that of the Doris, had promptly reported the breaks as the result of inspection of the interior of the hull, the tug would have rested under the duty of at once beaching the Ryan, has not been discussed.

That seems to present the only real problem in the case. Clearly if the tug's captain had been made aware of the breaking of these planks, he would have been required to exercise the skill and care of a prudent navigator to at once place the Ryan in a safe berth, i.e., to beach her. That was realized for the Dauntless, since the Answer to the amended Petition alleges that such was "necessary"—not, however, that it was done. Cases dealing with a tug's duty under comparable circumstances are: Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172; Sinram et al. v. Pennsylvania R. Co., 2 Cir., 61 F.2d 767; Thorne, Neale & Co., Inc., v. Reading Co., 2 Cir., 87 F.2d 694; The Mack, D.C., 18 F.Supp. 69. In none of these, however, does it appear that the captain of the tug did not in fact know or learn of the damage to the vessel in his tow, the happening of which set in motion the duty of care and attention consistent with prudent navigation. It is not intimated in any of these cases that the tug's master may safely refrain from making such inquiry as the circumstances may seem to require, and thus insulate himself from the impact of what inevitably would have been so revealed.

It is to be remembered that the Ryan was not being towed astern on hawsers; she was alongside the tug, and the shock of this collision was felt by Pederson who was in the pilot house of the tug. Within a short time he observed the object that did the damage, and later requested the bargee of the Doris to go aboard the Ryan, and from him received the report: "Right now I can see nothing." Pederson said that he himself observed nothing about the Ryan, and so proceeded north in the river, and then turned around as has been recited.

■ The docking at Edgewater is unexplained; it would be consistent with a misgiving which on the stand Pederson disclaimed; however, it is not presently considered that Pederson has demonstrated a satisfactory performance of duty. The hanging up of the barges at the pier end must have been for some reason, but none has been stated. The opportunity for inspection of the Ryan was then present, for Pederson could have moored his tug to the outside barge, Doris, called a deckhand to the pilot house, and himself gone aboard the Ryan and inspected her hull, to establish whether it was safe to leave her at the pier end. It is true that the breaking of the planks had already occurred, and nothing that Pederson could have discovered would change that condition, which means, since that damage was not due to negligence on the part of Christie, the latter has gone forward with proof to meet the libellant's prima facie case, and the latter has not resumed with an offer of proof required to sustain its burden.

■ However, as to such damage as may have resulted solely from the submerging of the Ryan, it seems to me that Christie must be held to answer on the theory that the tug did not perform her full duty, once she became chargeable with notice of probable damage to the Ryan. That was a separate duty which was consequent upon the collision, and is deemed and found not to have been discharged.

The decree is to be settled on notice and is to provide:

(1) The Amended Petition under Rule 56 is dismissed with costs.

(2) The libel is dismissed as to collision damage to the Ryan without costs.

(3) The libellant is to take the usual interlocutory decree against the respondent as to damages to the Ryan resulting from her sinking. If such damages are proved before the Master, the award in final decree shall carry costs against the respondent. If no such damages are proved, the Master will so report, and if his report be confirmed, final decree shall be to the effect that libellant has failed in its proof, and the libel will be dismissed in its entirety with costs to the respondent.