**B. W. KING, INC., as owner of the DECK SCOW MONA, Plaintiff,**

v.

**CONSOLIDATED IRON & METAL COMPANY, Inc., Defendant.**

No. 64 Ad. 1450.

United States District Court,
S. D. New York.

Feb. 10, 1970.

Macklin, Hanan & McKernan, by Timothy A. Hanan, New York City, for plaintiff.

Enrico S. San Filippo, New York City, for defendant.

CANNELLA, District Judge.

Plaintiff sues in admiralty to recover for damage to its scow "Mona" allegedly caused by the defendant. The court finds that plaintiff has failed to prove by a fair preponderance of the evidence the liability of the defendant. Judgment is rendered for the defendant, and the complaint is dismissed.

The court has jurisdiction over this *in personam* action pursuant to 28 U.S.C. § 1333(1).

The facts in this case are not essentially in dispute.[1] Plaintiff and defendant are both New York corporations with places of business within this District. Plaintiff at the time of the alleged damage was the owner of the Mona,[2] a wooden deck scow of 1928 vintage—some 114 feet in overall length, 34 feet in extreme breadth and ten feet in depth—with a cargo area delimited by two wooden bulkheads located some 15 feet from either rake end and coamings or railings three feet high and set in about two feet from the sides of the scow. The Mona was not self propelled, but she did have a cabin on one rake end for the use of the only crew member, the barge captain who lived on board. The scow was normally employed in the carriage of scrap iron and steel.

Defendant Consolidated Iron & Metal Company, Inc. engages in the business of processing and selling scrap, much of which is first pressed into bales varying somewhat in size but generally two feet square by five feet long and weighing about 1200 pounds.[3] Defendant has a plant at Newburgh, New York and a bulkhead located directly on the Hudson River, along which scows are loaded with scrap (bales).

The defendant has used plaintiff's scows for a number of years to transport scrap to various destinations within the Port of New York. As a result of these dealings, the parties had an established procedure for the hiring of a scow. The defendant would inform plaintiff by telephone of the readiness for shipment of a certain quantity of scrap, its destination and the time when the scow was desired. The plaintiff would then choose and arrange for the scow and contact a towing company to deliver it to the defendant's bulkhead at Newburgh. After loading was complete, defendant would notify plaintiff who would again arrange for towage to the desired destination. No written argeement or memorandum of this arrangement was kept except a logbook entitled "Record of Charters and Freight, No. 5, B. W. King"[4] and various billing receipts.[5] During the period of time in question, defendant would pay plaintiff $45 per day for the scow, any overtime of the barge captain, and the towage fees.[6] Initially, however, the plaintiff would pay the towing company and barge captain and then simply bill the defendant for the sums paid.[7]

In accordance with past practice, defendant notified plaintiff on May 29, 1963 that it had a cargo of No. 2 baled scrap for transportation to Pier 7, Jersey City, New Jersey. Plaintiff arranged for the Mona to be towed to Newburgh. Upon arriving at the defendant's bulkhead, the barge captain, Axel Fredenlund, secured the scow adjacent to the bulkhead and thereafter tended the lines as necessary. He testified that he inspected the Mona prior to any loading and that he observed no damage.[8] Likewise, defendant's President, Edward Laskin, testified that he observed generally the scow and noted nothing wrong.[9] The only substantiated examination of the internals of the scow which was documented was a survey performed by a Charles Aldrich on May 27, 1963.[10]

---

1. See generally Pre-Trial Order, dated Nov. 23, 1966.

2. Subsequent to the damage, repairs were not deemed practicable. and the scow was disposed of by the plaintiff.

3. See Trial Minutes, p. 201.

4. Plaintiff's Exhibit 1.

5. See Plaintiff's Exhibits 1, 2 & 6.

6. See Trial Minutes, pp. 10, 26.

7. See Trial Minutes, p. 11.

8. See Trial Minutes, p. 68.

9. See Trial Minutes, pp. 166–167. However, this examination was cursory in nature, and it is not clear that anyone examined the internals of the scow prior to loading.

10. See Defendant's Exhibit S. The survey does not indicate any major damage; however, it does indicate numerous minor items which would have required attention.

However, at this survey, no representative of the defendant was present, and Mr. Aldrich was at that time representing M. J. Rudolph Co., Inc. The survey report is signed without prejudice. Therefore, it is difficult to see how this survey could bind either party to the present action. Numerous other survey reports were introduced into evidence,[11] along with repair specifications of various dates,[12] which tend to show that the Mona was in a generally poor condition. This is probably not unusual, considering her age.[13] The court finds that the plaintiff has failed to prove by a fair preponderance of the evidence the condition of the Mona's internals *prior* to its loading with the bales of scrap.

The bales were loaded on the Mona by a crane operated by one Leroy Williams, an employee of the defendant, who had another employee of defendant spotting the bales for him on the scow until it was loaded high enough for him to see the work.[14] The crane was a diesel powered Link Belt 20-ton crane with a 55 foot boom and an electric magnet attached to the running gear which was used to lift the bales and place them aboard the scow. The loading operation spanned three days, June 1–3, 1963. During this time, plaintiff's barge captain was present constantly since he resided on the scow, and defendant's President Laskin was intermittently present. The scow was ultimately loaded with some 520 tons of scrap, approximately 4–4½ tiers high, which were loaded from the offshore to the inshore side starting in the "stern" of the scow. After one tier was complete, a second tier would be loaded, and so on until the entire load was aboard. The barge captain testified that he thought the crane operator slung or flung the bales into position. This was apparently based upon the incorrect premise that the crane could not reach the entire area of the cargo box [15] and the supposition that this would have caused the damage which was subsequently found.[16] This directly contradicts the testimony of the crane operator and defendant's President.[17] The barge captain admitted that no steps were taken to stop any such "flinging" of the bales.[18] Even though plaintiff's President, "Miss" King, views the barge captain's job as basically that of a watchman,[19] he nevertheless is generally responsible for the scow's condition, and reports directly to his employer, the plaintiff, any damage done to the scow. It is therefore inconceivable that he would stand idly by and allow "his" scow to be battered by bales of scrap.[20]

After the Mona had been loaded, the barge captain testified that he inspected the scow and found broken internals—the stringers which support the deck.[21] He did not notify his employer immediately, but rather called them early the next day. He apparently never personally notified the defendant, who was appraised of the damage by the plaintiff some time later. After notification by the barge captain, the plaintiff called Mr. Aldrich and asked him to survey the scow for damage. He apparently visited the vessel several

---

11. See, e. g., Defendant's Exhibits O, P, Q & R.

12. See, e. g., Defendant's Exhibits A–F.

13. The question of age and condition are material to this case in as much as the defendant contends that the Mona's damage *could* have been the result of old age and improper maintenance.

14. See Trial Minutes, pp. 253–254, 266–267.

15. See Trial Minutes, pp. 66, 206–14.

16. See Trial Minutes, pp. 97–100, 102–06.

17. See Trial Minutes, pp. 263–68, 205–08.

18. See Trial Minutes, p. 104.

19. See Trial Minutes, pp. 14–15.

20. It must be remembered that the barge captain lived aboard the scow and that he would be on board when the "damaged" scow was towed elsewhere. Thus, not only the vessel's, but his own, safety was at stake.

21. See Trial Minutes, pp. 68–69.

times;[22] however, a formal survey and report was not made until August 28, 1963.[23] This survey was conducted with a Mr. Louis, who represented the defendant's insurance carrier.[24] The survey report sets forth the damage to the Mona as being four broken deck stringers. The survey report does not list any damages which were previously noted, nor does it even refer to them.[25]

■ Miss King referred to the arrangement entered into with the defendant as a "standard New York oral [harbor] charter".[26] Plaintiff argues that this arrangement was a demise charter of the scow. While it is true that such oral agreements have been held under certain conditions to be valid demise charters,[27] *no* demise charter was entered into by the parties herein. In order to create such a charter, there must be a relinquishment of all control over the ship, barge or scow. The Supreme Court stated in Guzman v. Pichirilo:[28]

> To create a demise [charter] the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to

the demisee. [citations omitted] It is therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all. 369 U.S. at 699–700, 82 S.Ct. at 1096.

The plaintiff has not proven any such relinquishment of all control here.

■ The cases cited above[29] concern a situation where the barge or scow is orally chartered to the other party and this party then tows the vessel away and utilizes it in its business between destinations unknown to the owner. In those cases, all control was clearly relinquished, even though the owner kept a barge captain aboard. However, here that degree of control was not relinquished according to the proof presented. Plaintiff, in addition to having a barge captain aboard the Mona, had him make direct reports and generally tend the lines and the vessel. The barge captain was in no way under the control of the defendant. Furthermore, the plaintiff arranged for all towing and navigation of the scow and

22. See Trial Minutes, pp. 158–161. Once he was the only surveyor, and, another time, a Mr. Lally was present.

23. See Plaintiff's Exhibit 5. This formal survey is some 2½ months after the alleged damage and after the scow made at least one more trip. See Trial Minutes, pp. 19–20.

24. The insurance carrier subsequently disclaimed all liability.

25. Compare Plaintiff's Exhibit 5 with Defendant's Exhibit S.

26. Trial Minutes, p. 10. See Pennsylvania R. R. Co. v. McAllister Bros. Inc., 137 F.Supp. 788 (S.D.N.Y.1956).

27. See McGeeney v. Moran Towing Corp., 149 F.2d 791 (2d Cir. 1945); Edward G. Murray Lighterage & Transp. Co. v. Pennsylvania R. R., 130 F.2d 199 (2d Cir. 1942); Ira S. Bushey & Sons v. W. E. Hedger & Co., 40 F.2d 417 (2d Cir. 1930); Rogers v. Moran Towing & Transp. Co., 20 F.2d 558 (2d Cir. 1927); R. D. Wood Co. v. Phoenix Steel Corp., 211 F.Supp. 924 (E.D.Pa.1962); Pennsylvania R. R. Co. v. McAllister Bros.

Inc., supra, note 26; Tanker Hygrade No. 2, Inc. v. Barge Lines, Inc., 148 F. Supp. 177 (S.D.N.Y.1956).

But see dictum in Cory & Son v. Dorman Long & Co., [1936] 41 Com.Cas. 224, that it is doubtful if a true demise charter can be entered into except in writing. See also Gilmore & Black, The Law of Admiralty § 4–20 (1957); Scrutton, Charter parties and Bills of Lading 4–8 (17th ed. 1964).

28. 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed. 2d 205 (1962). See United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L. Ed. 403 (1894); Baumvoll v. Gilchrest & Co., [1892] 1 Q.B. 253, 259; Gilmore & Black, Law of Admiralty 215–217 (1957); Scrutton, Charter parties and Bills of Lading 4–8 (17th ed. 1964).

29. Footnote 27. See also In re Rice's petition, 294 F.2d 272 (2d Cir. 1961) (S.D.N.Y. opinion in 1960 A.M.C. 419); New York Central R. R. v. New York, N. H. & H. R. R., 1959 A.M.C. 1213 (S.D.N.Y.1959); O'Donnell v. Schiavone-Bonomo Corp., 1958 A.M.C. 2196 (S.D. N.Y.1958).

knew its destination and use. Since all control was not relinquished, there cannot be a demise charter. In a case not unlike this one, the District Court for the Eastern District of Pennsylvania reached a similar conclusion. See Woodward & Dickerson, Inc. v. I. P. Thomas & Son Co., 1955 A.M.C. 1311 (E.D.Pa. 1955) (not officially reported).

█ Since the arrangement between the parties was not a demise charter, plaintiff cannot rely upon the presumption that the damage was occasioned by the negligence of the charterer. See In re Rice's Petition, 294 F.2d 272 (2d Cir. 1961); The Etta, 37 F.2d 952 (E.D.N.Y.1930). Rather, the plaintiff must prove negligence on the part of the defendant and that this negligence was the proximate cause of the damage. Rogers v. Moran Towing & Transp. Co., 20 F.2d 558, 560 (2d Cir. 1927); O'Donnell v. Schiavone-Bonomo Corp., 1958 A.M.C. 2196 (S.D.N.Y.1958) (not officially reported); Woodward & Dickerson, Inc. v. I. P. Thomas & Son, Co., supra. The plaintiff has failed to prove negligence on the part of the defendant. The court, after weighing all the evidence and the credibility of the witnesses, finds that plaintiff has failed to prove that the defendant was negligent in his loading process [30] or that defendant's loading was the proximate cause of the damage to the Mona.[31]

█ Even if this court had found that there was a demise charter between the parties herein, defendant has produced sufficient evidence to rebut the presumption that the damage to the Mona was the result of any negligence on his part. See, e. g., In re Rice's Petition, supra; Seaboard Sand & Gravel Corp. v. American Stevedores, 151 F.2d 846 (2d Cir. 1946).

In addition, the plaintiff has failed to establish the prior condition of the Mona through any evidence which is binding upon the defendant. To prove prior condition, plaintiff must do more than merely prove that the barge captain *thought* it was in good condition. Furthermore, the barge captain should have stopped any improper loading by the defendant, if such had occurred, and failure to do so would be negligence chargeable to the plaintiff. See O'Donnell Transp. Co. v. Tidewater Iron & Steel Co., 90 F.Supp. 953 (D.N.J.1950); The Daly No. 40, 76 F.Supp. 700 (E.D.N.Y. 1947). Thus, even if a demise charter existed between the parties, plaintiff has failed to sustain his burden of proof.

All motions upon which decision was reserved at trial are denied.

The foregoing shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

It is ordered that the complaint filed herein is dismissed, with costs to the defendant.

So ordered.

---

30. Even the plaintiff's barge captain admits that the scows were generally loaded in the same manner as here and that no damage was usually occasioned by such loadings. See Trial Minutes, pp. 106–108.

31. The court will not speculate on how the damage to the scow actually occurred. The basis of its holding is solely the failure of proof by the plaintiff. However, defendant's contentions that the damage could have been caused by old age, improper maintenance, prior existing conditions, post event loading, or the unloading of this shipment have not been refuted by the proof of the plaintiff.