**INGRAM BARGE CO., Plaintiff,**

v.

**WEST LAKE QUARRY & MATERIAL CO., INC., Defendant.**

**No. 71 A 369(1).**

United States District Court,
E. D. Missouri, E. D.

March 8, 1973.

Lucas & Murphy, St. Louis, Mo., for plaintiff.

Goldstein & Price, St. Louis, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, Chief Judge.

### Findings of Fact

1. Ingram Barge Co., a corporation, was at all times material hereto the owner of deck barges Joe Barrett, Elmo Barrett, WT–1200, BL–102, BL–104, BL–108 and BL–112.

2. West Lake Quarry and Material Co., Inc., a corporation, was at all times material hereto, the owner and operator of a rock quarry with barge-loading facilities at or about Ilmo, Missouri.

3. The WT series barges, the Joe Barrett, Elmo Barrett and WT–1200, are steel barges built by Nashville Bridge Company; the WT–1200 was built in 1958 and the Joe Barrett and Elmo Barrett were built in 1961. All barges of that series measure 40 feet wide, 195 feet long, and 9½ feet deep. They have twelve main bouyancy compartments and two rake compartments.

4. The BL series barges, the BL–102, BL–104, BL–108 and BL–112, were built by Jeffboat, Inc., in the latter part of 1966, and measure 35 feet wide, 200 feet long, and 10 feet deep. They have eight bouyancy compartments and two rake compartments.

5. The internal supporting structures of both series of barges are basically the same, being a deck of ½ inch steel, welded on top of deck stringers, which are U-shaped steel beams, laid on their sides, intermittently spaced and placed parallel to each other. These stringers are in turn welded on top of 9 inch channel irons, or top chords. Supporting these chords are vertical beams welded perpendicularly to the chords and diagonals. Giving added support are beams running diagonally between the verticals, thus forming a webbing. This entire structure is called a truss and there are three trusses per compartment in the WT series, and six trusses per compartment in the BL series of barges.

6. The external features of both series of barges are the same, being a flat deck surface with the loading area above the compartments. There are occasional timberheads and kevels placed throughout the deck, and access hatches to each compartment. On one side or the other of the deck, running the length of the compartments, is a 30 inch high sideboard, which serves the purpose of keeping stone off the river side of the deck on one side of the barge, thus permitting a walkway down the side of the barge when the barge is loaded, and of being a backstop for unloading purposes.

7. From the time these barges were put into service until the present day,

they had been engaged in the rock-hauling trade and had been loaded at Reed's Quarry in Gilbertsville, Kentucky, except for the instant loading. The method of loading at Reed's Quarry was by dumping onto the deck of the barge, rock which consisted of rip rap (weighing from 15 to 125 to 200 pounds), and quarry run (weighing of a fine dust to 3,000 pounds). The distance the rock fell would be anywhere from 6 to 14 feet.

8. The method of unloading this rip rap and quarry run stone is by means of a dragline bucket which is pulled across the deck from the side coaming, thus filling the bucket with stone. In the course of unloading a barge, the bucket will travel the full width of the barge and by successive trips will travel the full length of the barge. On at least one occurrence, during the time in question, the barges were unloaded by means of a tracked front end loader known as a hi-lift.

9. Rock barges will sustain severe wear and tear because of the nature of the trade. Decks will be washboarded, indentations will be made on the decks of the barge and over a period of time, a set down of the deck up to 2½ inches is not uncommon.

10. Ingram Barge Co. inspected each of the barges during the off season in the spring of 1968 at the Ingram repair facility. Any damage which was found on any barge was noted on an inspection report. The inspection was a general visual inspection and was made by John Fischer, who by his own admission is not an expert in barge construction and repair. The Elmo Barrett, the WT–1200, and the Joe Barrett, three of the four more heavily damaged barges, were inspected respectively on March 13–14, 1968, March 12, 1968, and February 20, 1968. At that time the Elmo Barrett was found to have 70–75 verticals which needed rewelding and were repaired; the inspection report for the WT–1200 showed that loose verticals (of an unspecified number and location) were

welded back and the inspection report for the Joe Barrett showed that loose braces (of an unspecified number and location) in three compartments were welded. Loose verticals will cause the deck to be weakened and subject to damage by loading. The inspection report on the other barges was unexceptional.

11. Subsequent to the inspection of the barges in the spring of 1968 and prior to loading at West Lake, the barges were in constant service and loaded at various times, all by Ingram Barge at Reed's Quarry with rip rap and/or quarry run each as follows: the Elmo Barrett was loaded twice, the WT–1200 was loaded four times, the Joe Barrett was loaded twice, the BL–102 was loaded three times, the BL–108 was loaded four times, the BL–104 was loaded twice and the BL–112 was loaded once. Subsequent to each loading at Reed's Quarry, the barges were, of course, unloaded at destination. At no time after any loading or unloading, and prior to the time that they were delivered to West Lake, was any inspection made of any of the barges to determine its condition and particularly the condition of the internal structures. Ingram Barge has failed to prove that the barges when delivered to West Lake for loading were "staunch, tight and in all respects seaworthy" and in good condition.

12. The barges were delivered to West Lake for loading in the summer of 1968 because Ingram Barge (Reed's Quarry) could not supply the heavier stone of 3–6 tons and 11–15 tons required by its contract.

13. West Lake used four pieces of equipment to load the barges: a Euclid 27-ton truck; a Michigan 375 front-end loader, with a lifting capacity of 29,000 lbs.; and an experimental model of a front-end loader with a maximum weight of 83,530 lbs.

14. West Lake loaded the barges by first constructing a ramp of small chat rock up to the barge being loaded and then a front-end loader would drive over this ramp onto the barge and deposit the load of stone on the far end of the barge. Thereafter, the Euclid truck would back out the length of the barge and dump the stone against the pile of stone laid there on the prior load.

15. Each barge was loaded once by West Lake with the exception of the Joe Barrett, which was loaded twice. The barges were loaded with coverstone, weighing 3–6 tons, except for the WT–1200, which carried a split load of 3–6 ton coverstone, together with 20 pieces of 11–15 ton coverstone. No inspection was made after the West Lake loading or within a reasonable time thereafter of the internal structures of the barges to determine their condition at that time, even though Fischer was worried about the possibility of damage being done to the barges. After the loading at West Lake, the Joe Barrett was again loaded at Reed's and unloaded at its destination and no inspection of the barge was made prior to the time that it was delivered to West Lake in late summer of 1968 for another loading. No inspection was made of the barge Joe Barrett after the second loading at West Lake.

16. Each barge, including the Joe Barrett after its second loading at West Lake, was loaded at least one additional time at Reed's Quarry by Ingram Barge after the loading at West Lake and before any damage to the barges was discovered.

17. None of the barges was inspected after the West Lake Loading and prior to the discovery of any damages except the Elmo Barrett. Ingram Barge inspected this barge on September 2, 1968, and found only minor damage on the deck of the barge. No damage to the internal structures was noted.

18. During the late fall of 1968, Mr. Fischer noted damages appearing on the deck of one of the barges. Thereafter, the plaintiff had the various barges surveyed by Cairo Marine Service over a period of time, beginning on October 18, 1968, and extending through January 2, 1969, a period ranging from 4 to 6

months after the barges had been loaded at West Lake. At that time, damage was noted to the internal structures of the Elmo Barrett, WT–1200, Joe Barrett, and BL–102, with minor damage to the BL–108, BL–104, and BL–112.

19. The damages varied within each barge. Damage to the various compartments within the respective barges was not uniform ranging from no damage in some compartments to heavy damage in others. Just as important is the fact that the damage varied widely from barge to barge, ranging from virtually no damage to the BL–104 to heavy damage on the Joe Barrett. Since the barges were loaded with the same cargo, by the same method and within the same period of time by West Lake, the expectation would be that if the damage was caused by the West Lake loading, it would be approximately uniform within each barge and uniform from barge to barge. This uniformity was absent.

20. One of plaintiff's expert witnesses, its surveyor, refused to give an opinion as to the cause of the damages. Plaintiff's other expert witness, a naval architect, although he stated after some hesitation that "much" of the damage could have been caused by West Lake's method of loading, admitted that since he did not know the condition of the barges prior to their delivery to West Lake, he could not state with any certainty that the damage was done by West Lake. West Lake's expert witness, its surveyor, testified that the damages that he found on the barges were not caused by one loading such as West Lake's, but instead, had been incurred over a period of time involving successive impact loadings which was the method used at Reed's Quarry. In support of that opinion, the surveyor said that the damage was not uniform within each barge, or from barge to barge, and further that he had determined during the survey by an examination of the internals, that they had not failed at approximately the same time, but instead had failed over a period of time.

21. Plaintiff's experts estimated the cost of repairs to be between $131,250.00 and $146,250.00. Defendant's expert estimated the cost of repairs to be $73,-162.00.

22. The evidence before the Court fails to show whether the damage to the barges was caused by loading at Reed's Quarry; loading at West Lake; or unloading in Florida on the jobsite.

### Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter is within its Admiralty and Maritime jurisdiction.

2. Ingram Barge has failed to prove and show as alleged in its complaint that the subject barges were tight, staunch and seaworthy and in good condition and order when delivered to West Lake. By its failure to show such condition of the barges, Ingram Barge has failed to make a prima facie case. B. W. King, Inc. v. Consolidated Iron & Metal Co., 310 F.Supp. 471 (S.D.N.Y.1970); The Daly No. 40, 76 F.Supp. 700 (E.D.N.Y.1947); Seaboard Sand & Gravel Corp. v. American Stevedores, 151 F.2d 846 (2nd Cir. 1945); O'Donnell Transportation Co. v. Tidewater Iron and Steel Co., 90 F.Supp. 953 (D.C.N.J.1950). This requirement is present whether Ingram Barge is proceeding on a theory of bailment or on specific negligence. Seaboard Sand & Gravel Corp. v. American Stevedores, supra; B. W. King, Inc. v. Consolidated Iron & Metal Co., supra. Ingram Barge has failed in its proof to support this necessary requirement. Ingram Barge has failed to show the condition of the barges either (1) at the time they were delivered to West Lake for loading; or (2) after the loading at West Lake and before other persons, including Ingram Barge's employees, handled the barges.

3. Ingram Barge has failed to show by a preponderance of the evidence any negligence and proximate cause of the damage on the part of West Lake in the manner in which it loaded the barges. Whether Ingram Barge pro-

ceeded in bailment or specific negligence, it has failed to come forth with proof either in the first instance or after West Lake's proof to show negligence on the part of West Lake. Rogers v. Moran Transportation Co., 20 F.2d 558 (2nd Cir. 1927); Seaboard Sand & Gravel Corp. v. American Stevedores, supra; The Fed. No. 1, 27 F.Supp. 907 (E.D.N.Y.1939); The Daly No. 40, supra; B. W. King, Inc. v. Consolidated Iron & Metal Co., supra. Messrs. White, Fischer, and Combs knew the method of loading, observed it, and did not protest or object when or if they believed the barges were in danger. B. W. King v. Consolidated Iron & Metal Co., supra; O'Donnell Transportation Co. v. Tidewater Iron and Steel Co., supra. Ingram Barge failed to inspect the subject barges within a reasonable time after loading by West Lake and there is no evidence showing what the condition of the barges was subsequent to that loading. The plaintiff's expert surveyor, Mr. Yoemans, had no opinion as to the cause of the damage that he found. Mr. MacCutcheon, a naval architect, produced by plaintiff could not state with any certainty that the loading of West Lake caused the damage. On the other hand, the evidence is persuasive that Mr. Leithner was correct in his opinion that the damage occurred over a period of time involving repeated loadings, as shown by the facts that the internal structures failed at different times and that the damage was not uniform within each barge and from barge to barge.

■ 4. Plaintiff has failed to prove its damages. The barges have been in constant use since the survey and the condition surveys are not sufficient in detail to form a reliable opinion on damages. The evidence of damage and its cause is speculative. The J. T. Easton, 24 F. 95 (S.D.N.Y.1885); Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32 (2nd Cir. 1948); J. R. Atkins v. Alabama Drydock and Shipbuilding Co., 195 F. Supp. 944 (S.D.Ala.S.D.1960); Bleakley Transportation Co., Inc. v. Colonial Sand and Steel Co., Inc., 245 F.2d 576 (2nd

Cir. 1957); Petition of Metropolitan Sand and Gravel Corp. etc. v. Colonial Sand and Stone Co., Inc., 170 F.Supp. 675 (E.D.N.Y.1958).