Charles A. ROTHER

v.

INTERSTATE AND OCEAN TRANSPORT COMPANY.

Civ. A. No. 77–2792.

United States District Court, E. D. Pennsylvania.

May 24, 1982.

Stephen T. Saltz, Philadelphia, Pa., for plaintiff.

Richard W. Hollstein, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

### I. FINDINGS OF FACT

#### A. LIABILITY

1. On September 5, 1975, United States Steel Corporation ("USS") employed Charles A. Rother ("Rother") as a fuel utility man at its Fairless Hills works.

2. It was part of Rother's job as a fuels utility man for him to meet barges discharging fuel oil at the pier and to connect the discharging hose from the barge to the intake valve on the USS pier.

3. Rother had performed the work of connecting fuel lines to discharge cargo for at least one year prior to the date of this accident.

4. USS was the purchaser of fuel oil delivered to the Fairless Hills works on September 5, 1975 by Interstate and Ocean Transport Company ("Interstate") Barge # 37 ("Barge # 37" or "the Barge")

5. On September 5, 1975, Interstate operated, managed, possessed and controlled Barge # 37 under a bare boat charter.

6. On September 5, 1975, Interstate was the employer of John Franceschi as a tankerman aboard Barge # 37.

7. On September 5, 1975, Rother was assigned to hook up a hose from Barge # 37 to a valve on the USS pier so that fuel could flow through the hose and be discharged from the Barge.

8. The dispatcher's log for USS on September 4, 1975 states that Barge # 37 would be arriving with low sulphur fuel oil the next day at 12:00 noon.

9. On September 5, 1975, a tug brought Barge # 37 to the USS dock. The log book for Barge # 37 notes that it arrived at the USS facility at 11:25 a. m.

10. The dispatcher's log for USS on September 5, 1975 states that Rother was notified that Barge # 37 was in at 12:45 p. m.

11. On September 5, 1975, Rother arrived at the discharge point on the USS pier at approximately 1:00 p. m. Rother arrived at the discharge point by a truck which had a two-way radio available for his use.

12. The deck of the Barge was approximately six feet below the level of the pier at the time Rother arrived.

13. The captain of Barge # 37 discharged the tug boats at least one hour before Rother appeared at the dock. The Barge, once moored, could not be moved without the assistance of the tugboats.

14. Rother did not have any authority to order that the tug boats return in order to reposition the Barge.

15. The captain of Barge # 37 had sole discretion whether and when to discharge the tug boats.

16. The Barge will rise approximately 13 feet during discharge and there is a 4 to 5 foot change in tide. The Barge must be positioned so that excessive strain on the hose will not damage equipment or cause oil spills; Rother did not have any authority to tell the captain of the Barge where to dock it.

17. The captain of the Barge has sole discretion as to where to dock the Barge.

18. It was the responsibility of the captain of Barge # 37 to put the Barge at the dock so that the cargo hose would safely reach the valve on the pier.

19. The intake valve is five feet from the water; a metal platform with a railing extends out over the water; and the railing is not removable.

20. The platform and railing had been built to protect USS employees from falling into the water when connecting the discharge hose to the intake valve.

21. Because of the rail, barge discharge hoses had to be placed at a five-foot opening in the rail in order to reach the intake valve.

22. The rail at the discharge point and the closeness of the discharge point to the water made moving the discharge hose to the intake valve difficult. For this reason, shore side personnel frequently had to move the hose across the railing to connect it to the intake valve.

23. The captain of Barge # 37 had been at the USS dock on several occasions before and was aware of the physical surroundings.

24. Defendants knew that it was difficult to connect the Barge hose at the USS pier.

25. The captain of Barge # 37 knew that the railing had to be cleared in order to connect the ship hose to the pier valve.

26. The captain of Barge # 37 knew that at USS the hose was moved to the valve by one man.

27. The captain of Barge # 37 knew Rother and had unloaded oil with him before.

28. The hose utilized to discharge oil is moved from the barge to the discharge point through the use of a boom.

29. On September 5, 1975, tankerman John Franceschi operated the boom on Barge # 37 and swung the hose onto the pier.

30. As this operation was being performed, the hose came to rest on the pier next to the protective railing which had been installed by USS around the intake valve and metal platform.

31. After the hose came to rest on the pier, Mr. Franceschi and Barge # 37 played no further role in the movement of the hose to the intake valve.

32. Rother remained on the property of the USS facility in the area of the discharge point; Mr. Franceschi, remained on Barge # 37.

33. At no time did Rother request Mr. Franceschi to move the Barge or recall the

tugs so that the Barge could be moved into a different position.

34. At no time did Rother request Mr. Franceschi to aid him in moving the hose.

35. Mr. Franceschi had no duty to help Rother move the hose on the property of USS.

36. There was present, at the time of this incident, another employee of USS, who was not requested to assist Rother by Rother or anyone else.

37. Despite the fact that Rother had driven to the pier in a truck with a two-way radio, which he was authorized to use, he did not contact the dispatcher or his foreman requesting assistance either in the form of equipment or personnel to move the hose.

38. USS had not installed a winch crane or other lifting device at the discharge point to aid in the movement of hoses.

39. Rother was experienced in the connecting of discharge hoses from barges to the intake valve.

40. Rother knew that the discharge hose was quite heavy and that it would take a good deal of strength to lift the hose up and across the rail to the intake valve.

41. Rother on other occasions had physically moved the hose across the rail to hook it up to the valve.

42. On September 5, 1975, Rother lifted the discharge hose on to the rail which was approximately four-feet four-inches high; he then moved the hose across the rail.

43. As Rother was moving the hose, he felt a sharp pain in his arm.

44. Rother completed hooking up the hose and later that day went to the USS infirmary for treatment.

45. The discharge operation could have been delayed to enable the tugs to be recalled or equipment or other employees to be brought to the scene.

46. Mr. Franceschi and Interstate had no duty to intervene in Rother's activity, to instruct him, to supervise him or otherwise interfere with the manner in which Rother chose to handle the discharge hose to connect it to the intake valve.

47. The captain of Barge # 37 aligned the barge so that the hose was approximately ten feet from the fuel hook-up valve. The Barge was not properly aligned with the valve connection on the dock.

48. Because the Barge was not aligned properly, connecting the hose to the valve hook-up on the dock was more difficult.

49. Rother could have requested Mr. Franceschi to have the tugs return and move the Barge to the correct position.

50. Rother could have requested that another attempt be made to align the hose with the intake valve.

51. Rother could have requested the assistance of the employee who was present with him at the discharge point.

52. Rother could have used his two-way radio to request instructions from his foreman or requested equipment or personnel to aid him.

53. Rother was not careful when he lifted the hose across the rail and overestimated his strength in dealing with the situation as he found it.

B. THE SECTION 33(b) DEFENSE

54. Rother received compensation payments pursuant to the Longshoremen and Harbor Workers' Compensation Act from January 28, 1976 to March 21, 1976 in the total amount of $1,683.89, based upon a compensation rate per week of $222.40.

55. These compensation payments by Rother's employer under the Longshoremen and Harbor Workers' Compensation Act were voluntary.

56. On April 1, 1976, Rother's employer submitted Form BEC–202 (Employer's First Report of Accident or Occupational Illness) with regard to the accident that occurred on September 5, 1975; it was received by the U. S. Department of Labor ("DOL") on April 8, 1976.

57. On April 29, 1976, Rother's employer submitted to the DOL Form BEC–208 (Compensation Payments Stopped or Sus-

pended); this report states that the reason payments to Rother were stopped was that "claimant returned to work on 3/21/76."

58. Rother filed a Form LS–203 (Employee's Claim for Compensation), signed and dated May 18, 1976, with the DOL, transmitted by letter of Donald B. McCoy, Esquire, dated May 19, 1976; this claim was received on May 21, 1976.

59. On June 16, 1976, Deputy Commissioner, Donald Frederick, administering the Longshoremen's and Harbor Worker's Compensation Act, sent to plaintiff's employer a notice enclosing a copy of the Claim for Compensation filed by Rother dated May 18, 1976.

60. On July 9, 1976 Rother's employer filed with the DOL a "Notice to the Deputy Commissioner that Right to Compensation is Controverted," stating the objection that "claimant's disability was only from 1/28/76 to 3/21/76;" this was received by the DOL on July 13, 1976.

61. Rother's employer also filed with the DOL an "Answer of Employer or Insurance Carrier to Employee's Claim for Compensation," received by the DOL on July 13, 1976; it had attached to it Form BEC–208 reporting the voluntary payment of $1,683.89 as disability compensation between January 28, 1976 and March 20, 1976.

62. Rother commenced this lawsuit on August 11, 1977, at which time there had been no assignment to the employer of Rother's right to compensation.

63. No award of compensation has been made to Rother under the Longshoremen's and Harbor Workers' Compensation Act.

64. Rother has not accepted compensation under an award in a compensation order filed by the Deputy Commissioner or the Board.

C. DAMAGES

65. Rother was born on July 28, 1925.

66. Rother has been continuously employed with USS since February, 1953.

67. A person of plaintiff's age has a life expectancy of nineteen years according to the Life Expectancy Tables; United States Department of Health, Education and Welfare—Bureau of Vital Statistics.

68. Rother, had this accident not occurred, expected to work to the age of sixty-five.

69. Prior to September 5, 1975, Rother had no medical problems, disabilities or injuries to his left arm or hand.

70. Prior to September 5, 1975, Rother had equal strength in his left and right hands and arms.

71. As a result of this accident, Rother suffered a minor tear to the biceps tendon in the lower left arm.

72. After several weeks of treatment at the USS infirmary, Rother was examined by Dr. Bernard J. Amster.

73. Dr. Amster initially diagnosed Rother's condition as a severe sprain and had an EMG nerve conduction study conducted at Delaware Valley Hospital.

74. The results of the EMG study at Delaware Valley Hospital showed that Rother had an entrapment of the ulnar nerve at the level of the elbow at the site of the injury.

75. At some point in time, subsequent to March, 1976, Rother's torn biceps tendon healed.

76. On January 24, 1978, Rother was complaining of pain with swelling in the left elbow, front of the elbow, and along the ulnar area of the left elbow into the left forearm. There was a locking sensation on twisting the elbow, numbness of the fingers of the left hand, and a sense of weakness involving the left hand and left arm.

77. As a result of this injury, Rother has a physical difference in the appearance of his left elbow and wrist; there is also thickening in the area of the left biceps tendon near the proximal ulna.

78. As a result of this injury, there has been a grinding sensation in upper portion of forearm during twisting motion.

79. Rother developed a condition of post-traumatic left medial humeral epicondylitis.

80. Rother's limitations on the use of his left arm, while slight, are permanent in nature.

81. Rother lost no time from work from September 5, 1975 until January 28, 1976.

82. Rother was out of work from January 28, 1976 to March 20, 1976 during which time his left arm was immobilized.

83. Since March 21, 1976, Rother has not lost any time from employment as a result of this accident.

84. Since March 18, 1976, Rother has received no medical treatment and has seen no physicians other than for purposes of litigation.

85. Rother is right-handed; there is no atrophy in his left arm and his gripping power in his left hand is normal in relation to his right hand.

86. Rother spent $614 in medical expenses related to his biceps tendon tear and unrelated to litigation.

87. Rother lost $3,376 in wages between January 28, 1976 and March 20, 1976; if reduced by 28% on account of taxes, Rother has a wage loss of $2,431.

88. Rother has suffered a loss in future earning capacity as a result of this accident, calculated at $2,000 per year until his retirement at the age of sixty-five.

## II. DISCUSSION

### A. Liability—Standard of Care

Rother, an employee of USS, was injured while he sought to connect an oil discharge hose from Barge # 37, a vessel owned by defendant Interstate, to the intake valve of a land based oil storage facility owned by USS. He brought this action against vessel owner Interstate pursuant to the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b).[1] *Scindia Steam Navigation Co. v. Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), governs the standard of care applicable to Interstate.

In *Scindia*, a longshoreman, working in the vessel's hold, was hit by sacks of wheat which allegedly fell due to a defective winch. Affirming the Second Circuit's reversal of a summary judgment for the vessel owner, the Court held that "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Scindia, supra* at 175, 101 S.Ct. at 1626. While the vessel owner has no duty to inspect the stevedore-employer's cargo handling operation, it may be liable for such a malfunction if there were actual or constructive knowledge of a condition so clearly unsafe that the vessel owner should have stopped the loading operation until the condition was made safe. *Scindia, supra* at 175–78, 101 S.Ct. at 1626–27. In *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 657 F.2d 25, 26 (3d Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), on remand from the Supreme Court for further consideration in light of *Scindia*, the Court of Appeals reaffirmed that "reasonable knowledge" is the standard of care according to which vessel owners' actions are to be scrutinized.

1. 33 U.S.C. § 905(b) provides:
   (b) In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act [33 U.S.C. § 933], and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negli-
   gence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act.

At a minimum, we think that the standard of reasonable care under the circumstances would permit a finding of negligence upon a showing: (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board the ship that led to the injury; (2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

*Griffith, supra* at 26, (*quoting Griffith v. Wheeling-Pittsburgh Steel Corp.*, 610 F.2d 116, 125–26 (3d Cir. 1979)); *accord, McCarthy v. Silver Line, Ltd.*, 661 F.2d 298 (3d Cir. 1981) (*per curiam*).

■ In this case, the "condition" which led to Rother's injury was the position of the barge itself. The vessel owner knew from experience that the USS discharge facility provided difficult access to the oil intake valve. Given the weight of the hose, the vessel owner knew or should have known that extended movement of the hose over the dock rail posed an unreasonable risk of harm to Rother. With that knowledge, it was unreasonable for the vessel to discharge the tugboats without ascertaining if the hose would have direct access to the valve through the break in the rail and to fail to recall the tugs when it became apparent that there was not such access. *Cf. Sarauw v. Oceanic Navigation Corp.*, 655 F.2d 526 (3d Cir. 1981) (vessel owner had duty to exercise reasonable care with respect to a gangway even though gangway was supplied by stevedore and used solely by the injured longshoreman).

Rother was also negligent in attempting to handle that hose by himself in view of the location of the barge and the placement of the hose. This will reduce the amount of damages to which he is entitled by one-third (33⅓%). However, as the defense of assumption of risk is unavailable in this kind of case, Interstate cannot defend on the ground that Rother continued to work in the face of the obviously dangerous situation caused in part by an ill-designed discharge facility which his employer was continuing to use. *Scindia, supra* at 176 n.22, 101 S.Ct. at 1626 n.22.[2]

## B. *The Section 33(b) Defense*

■ Interstate contends that Rother is not the real party in interest in this case because he brought suit more than six months after he accepted voluntary compensation payments from his employer.[3] Section 33(b) of the LHWCA, 33 U.S.C. § 933(b) provides:

*Compensation for injuries where third persons are liable*

(a) *Election of remedies.* If on account of a disability or death for which compensation is payable under this Act, the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person.

(b) *Acceptance of compensation acting as assignment.* Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner of Board shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person unless such person shall commence an action against such person within six months after such award.

Interstate argues that acceptance of voluntary compensation benefits by Rother is equivalent to "acceptance of . . . compensation *under an award in a compensation or-*

---

**2.** Rother's damages will not be reduced by the degree of fault, if any, of his employer, USS. *See, Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); *Sarauw v. Oceanic Navigation Corp., supra.*

**3.** USS paid "sickness and accident benefits" to Rother in an amount totalling $1,683.89 from January 28, 1976 to March 20, 1976. (Ex. D–13, Form BEC–208). Rother commenced this action on August 11, 1977.

*der filed by the deputy commissioner of Board,"* 33 U.S.C. § 933(b) (emphasis added), and that Rother's right of action against Interstate and Ocean was assigned by law to Rother's employer, USS. We reject this interpretation of the statute.

Rother received voluntary compensation payments from USS through March 20, 1976. USS then filed notice with the DOL that the payments were stopped. (Ex. D–13, Form BEC–208).[4] On April 1, 1976, USS filed an Employer's First Report of Accident or Occupational Illness. (Ex. D–13, Form BEC–202). Rother filed an Employee's Claim for Compensation (Ex. D–13, Form LS–203) on May 18, 1976. USS notified DOL on July 9, 1976 that this claim was controverted. In its answer to Rother's claim, USS denied that Rother was permanently or temporarily disabled to the extent or for the period stated in his application. (Ex. D–13, Form LS–207; Form BEC–215). The DOL's administrative file (Ex. D–13), produced at trial, shows no further action towards the resolution of this matter; there was no informal conference, formal hearing, settlement agreement, order or award, all of which were provided for in the federal regulations. *See,* 20 C.F.R. § 702.241 *et seq.* (1976).

Interstate argues that if more than six months have elapsed since the last voluntary compensation payment and the various forms noted above have been filed with the DOL by the employer, the Section 33(b) bar applies. *See, Simmons v. Sea-Land Services, Inc.,* 676 F.2d 106 (4th Cir. 1982); *Caldwell v. Ogden Sea Transport, Inc.,* 618 F.2d 1037 (4th Cir. 1980); *Liberty Mutual Insurance Company v. Ameta & Co.,* 564 F.2d 1097 (4th Cir. 1977); *Incorvaia v. Flota Mercante Grancolombia, S.A.,* No. 79 Civ. 1550 (WCC) (S.D.N.Y. filed July 1, 1981). The court in *Liberty Mutual* held that the receipt, filing and acceptance by the DOL of these forms

... constituted sufficient affirmative action and a determination by the deputy commissioner granting benefits ... so as to constitute an 'award' of benefits in a compensation order under 33 U.S.C. § 933(b) without entry of a formal award.

*Liberty Mutual, supra* at 1103. The rationale is that an employer should not be required to controvert every claim for compensation and obtain a formal award in order to preserve the assignment for which the statute provides. *Id.* In *Simmons,* the court found that an award is created by the completion of three events: (1) the employer, having not contravened its liability, initiates compensation payments; (2) the DOL files the employer's notice of payments; and (3) the longshoreman accepts any of the payments. *Simmons, supra,* 676 F.2d at 109.

In *Rodriguez v. Compass Shipping Co.,* 456 F.Supp. 1014 (S.D.N.Y., 1978), *aff'd* 617 F.2d 955 (2d Cir. 1980), *aff'd,* 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981), the Second Circuit held that a settlement agreement embodied in a DOL form, executed after an informal conference between the employee, employer and claims examiner and signed by all three parties was a compensation "order" for purposes of statutory assignment. *Accord, Theodore v. Moore McCormack Lines, Inc.,* 516 F.Supp. 25 (S.D.N.Y.1981); *see, Ambrosino v. Transoceanic Steamship Co.,* 675 F.2d 470, (2d Cir. 1982); *Vederame v. Torm Lines,* 670 F.2d 5 (2d Cir. 1982). But the Supreme Court, in reviewing that decision explicitly only assumed, and declined to decide, that the Second Circuit was correct. *Rodriguez, supra,* 451 U.S. at 598–599 n.3, 101 S.Ct. at 1948 n.3. Moreover, the documents filed here by USS differ markedly from a settlement agreement endorsed by the DOL following an informal conference.

To hold that voluntary acceptance of some compensation is tantamount to an

---

4. These payments, pursuant to 33 U.S.C. § 914, were captioned "payment of compensation without an award" in 20 C.F.R. § 702.231 (1976). The regulation at that time, read:

Unless the employer controverts his liability to pay compensation under the Act, he shall pay periodically, promptly and directly to the person entitled thereto the benefits prescribed by the Act.

award of benefits where the total amount of compensation remains contested on the record would misconstrue the statute. Prior to the 1938 Amendment to the LHWCA, the acceptance of compensation, absent any award, did create a statutory assignment of the claim. *Rodriguez, supra.* The 1938 Amendments added the words "award in the compensation order filed by the deputy commissioner." The purpose of providing for filing an order "was to insure that the claimant-employee knew that he was foregoing his right to sue by acceptance of the compensation agreement." *Rodriguez v. Compass Shipping Co.,* 617 F.2d 955, 959 (2d Cir. 1980), *aff'd,* 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981) (*citing* H.Rep. No.1945, 75th Cong., 3rd Sess. at 9 (1938)). The Amendment was enacted "so that mere acceptance of compensation, without an award, [would] not operate as an assignment to the employer of the injured employee's cause of action against a third party tortfeasor ..." *American Stevedores, Inc. v. Porello,* 330 U.S. 446, 454, 67 S.Ct. 847, 851, 91 L.Ed. 1011 (1947).

A formal order or even a DOL sanctioned settlement agreement, following an informal conference of employer, employee and claims examiner, *see, Rodriguez, supra,* may provide such notice, but the filing of Forms BEC–202, BEC–208, LS–207, and BEC–215 by USS does not. *See, Moses v. Samband Islenzkra Samvinnfelaga,* No. 79–0051–MA (D.Ma., filed January 19, 1982) (the appropriate test for abandoning the requirement of a formal award is whether the parties understand they are settling their claims). In our District, in these circumstances, the Section 33(b) bar does not apply. *Klitznsky v. Pakistan Shipping Co.,* 530 F.Supp. 326 (E.D.Pa.1981); *Dunbar v. Retla Steamship Co.,* 484 F.Supp. 1308 (E.D.Pa.1980); *Svitak v. C.A. Venezolana De Nav.,* No. 79–1579 (E.D.Pa., filed February 19, 1980) (*citing Ellis v. Cia Paraguaya De Navegacion De Ultramar S.A.,* No. 78–2949 (E.D.Pa., filed February 7, 1979) and *Rickettes v. Hamburg-Sudamerikanische Dampfschiff, Ges. Eggert and Amsinck,* No. 77–1975 (E.D.Pa., filed July 31, 1979)).

In this case, unlike the Fourth Circuit cases cited above, the employee, Rother, filed a claim for additional compensation within two months of his employer's termination of voluntary payments *and the employer did controvert that claim.*[5] This disputed claim has not yet been resolved; the present action against Interstate, an alleged third party tortfeasor, was commenced before its resolution. John J. McTaggart, Assistant Deputy Commissioner, Employment Standards Administration, Office of Workers' Compensation Programs, United States Department of Labor, testified that USS could have assured a final determination of Rother's claim and secured its statutory right of assignment by requesting that DOL hold a hearing.[6] That is, the mecha-

---

**5.** These actions were then governed by 20 C.F.R. § 702.251 and 706.261 (1976) which provided as follows:

§ 702.251 *Employer's controversion of the right to compensation.*

Where the employer controverts the right to compensation after notice or knowledge of the injury or death, or after receipt of a written claim, he shall give notice thereof, stating the reasons for controverting the right to compensation, using the form prescribed by the Director. Such notice, or answer to the claim, shall be filed with the deputy commissioner within 14 days from the date the employer receives notice or has knowledge of the injury or death. The original notice shall be sent to the deputy commissioner having jurisdiction, and a copy thereof shall be given or mailed to the claimant.

§ 702.261 *Claimant's contest of actions taken by employer or carrier with respect to the claim.*

Where the claimant contests an action by the employer or carrier reducing, suspending, or terminating benefits, including medical care, he should immediately notify the office of the deputy commissioner having jurisdiction in person or in writing, and set forth the facts pertinent to his complaint.

**6.** *See* 20 C.F.R. § 702.316 (1976) which provided:

§ 702.316 *Conclusion of conference; no agreement on all matters with respect to the claim.*

When it becomes apparent during the course of the informal conference that agreement on all issues cannot be reached, the deputy commissioner shall bring the conference to a close and afterward prepare a

nism for getting an "award" and triggering Section 33(b) is to request a hearing. The administrative file which Mr. McTaggart produced proves that USS never sought a hearing and never obtained an award. When the employer controverts an employee's claim but fails to seek the administrative resolution readily available, a third party cannot be heard to complain that not applying the bar of a filed award to voluntary payments will discourage "voluntarism." Because USS controverted but did not seek to resolve Rother's claim, defendant's Section 33(b) affirmative defense fails.

## C. Damages

### i. Deduction of Income Taxes

[4] Damages for loss of past wages and impairment of future earning capacity must be reduced by the effective tax rate if they are to measure the losses Rother has actually suffered.[7] This is consistent with the Supreme Court's decision in *Norfolk and Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), which held that it was error, in a wrongful death action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, to exclude evidence of the income taxes payable on the decedent's past and estimated future earnings. The Supreme Court found such evidence to be a "relevant factor" in calculating the monetary loss, and it rejected the argument that its introduction was too speculative. *Liepelt, supra* at 494, 100 S.Ct. at 758. A defendant in a FELA suit is also entitled to an instruction that damages for lost future wages are not subject to federal income taxation; the Supreme Court has termed this a "federal common law rule" with "general applicabili-

ty." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 487 n.17, 101 S.Ct. 2870, 2880 n.17, 69 L.Ed.2d 784 (1981).

We see no reason to distinguish *Liepelt*; there is no case law or statutory history called to the court's attention to support deducting taxes in cases under the FELA but not the LHWCA. Therefore, income taxes should be deducted from the calculation of past and future lost earnings in a LHWCA action. *Roselli v. Hellenic Lines, Ltd.*, 524 F.Supp. 2 (CBM) (S.D.N.Y., 1980); *see, Weiland v. Pyramid Ventures Group*, 511 F.Supp. 1034 (M.D.La.1981); *see also, Varlack v. SWC Caribbean, Inc.*, 550 F.2d 171 (3d Cir. 1977).

### ii. Loss of Wages

The parties have stipulated that past loss of wages totaled $3,376; less taxes, net lost wages equal $2,431.

Rother has not established loss of future earnings by reason of a present diminished wage rate projected for his work life. His actual wage loss was confined to the period when his arm was in a cast and he was unable to work. His present wage rate is no less than at the time of his injury. However, Rother claims were it not for the injury he would have obtained a position as an apprentice at a grade higher than he now holds and that this would have resulted in additional wages of $2,000 a year for 12 years. While Rother passed the apprenticeship examination in 1974, he did not meet his burden of convincing the court that were it not for his injury he would have bid on an opening after his accident. Neither did his proof of increased wages in the

---

memorandum of conference setting forth only the issue or issues in dispute, such pertinent background as may be appropriate thereto, and his recommendations for resolution of the dispute. Copies of this memorandum shall then be sent by certified mail to each of the parties or their representatives, who shall then have 14 days in which to signify in writing to the deputy commissioner whether they agree or disagree with his recommendations. If they agree, the deputy commissioner shall proceed as in § 702.-315(a). If they disagree (Caution: See § 702.134(b)), then the deputy commissioner may schedule such further conference or conferences as, in his opinion, may bring about agreement or, if he is satisfied that any further conference would be unproductive or if any party has requested a hearing, he shall prepare the case for transfer to the Office of the Chief Administrative Law Judge (see § 702.331 et seq.).

7. The parties have stipulated to an effective tax rate of twenty-eight percent (28%).

event that he had been an apprentice and journeyman meet the requisite standard. Therefore, the claim for actual lost wages as an apprentice or as a future journeyman is rejected.

But Rother testified that he continues to have pain when he uses his left arm and this is consistent with the medical testimony. It is also consistent with his inability to perform the tasks of the change in position he sought (from Grade 9 to Grade 10). When he changed from field man to separation attendant (Grade 10), he was unable to perform ladder climbing without pain and returned to a position as auxiliary pump tender (Grade 9). The pain involves his left arm and Rother is right-handed. This might not be substantially disabling to office or other workers but to Rother whose earning capacity depends on his physical strength, loss of ability to use both arms is a reduction in future earning capacity for which he is entitled to compensation. Plaintiff is entitled to an award based on his working to the age of sixty-five.

In estimating $24,000 as reasonable compensation for impairment of earning capacity the court has considered that additional amounts if earned would have been subject to income tax which this award is not. Therefore, the net compensation is $17,280.[8]

### iii. *Medical Expenses*

The parties have stipulated that medical expenses unrelated to the litigation total $614.

### iv. *Pain and Suffering*

■ Rother is also entitled to an award for past and future pain and suffering. The court has considered the pain involved in the accident, inconvenience and pain involved in the hospitalization, anger and frustration for the period of lack of activity and permanent deprivation of certain types of use of his left arm. However, Rother has taken no medication for pain in his arm since 1976 which puts the claims of continued pain in perspective. The court has also considered Rother's claimed impairment of his sex life by reason of pain. No corroborative evidence, medical or otherwise, was produced and the testimony, appearance and demeanor of Rother do not convince the court this is credible.

Rother claims compensation for lost pride in his strength and physical prowess. Prior to this accident, he lifted weights on a regular basis and no longer feels able to do so. His left arm is not what it used to be which for him is a deprivation of life's pleasures. While his musculature appears to be developed beyond that of most males, the muscles of the left arm are not the equal of the right and a small lump on the left forearm below the elbow is demonstrable. This might not bother most men but it offends Rother's macho sense of self and is for that reason compensable. *See, Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453, 460 (3d Cir. 1982).

The court determines that the sum of $30,000 would compensate Rother for loss of life's pleasures and future pain and suffering.

### III. CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and the parties.

2. Plaintiff's claim is not barred by Section 33(b) of the Longshoremen's and Harbor Workers' Compensation Act.

3. Defendant's failure to exercise reasonable care to protect plaintiff was a proximate cause of plaintiff's injuries.

4. Plaintiff's negligence was also a proximate cause of his injuries; his comparative negligence is one third (33⅓%).

5. Plaintiff is entitled to damages in the sum of $33,550 calculated as follows:

| | |
|---|---|
| Net Lost Wages | $ 2,431.00 |
| Loss of Future Earning Capacity | 17,280.00 |
| Medical Expenses unrelated to Litigation | 614.00 |
| Pain and Suffering | 30,000.00 |
| Total | $50,325.00 |
| AWARD (⅔ × $50,325) | $33,550.00 |

---

**8.** This figure is not discounted to present value or adjusted for inflation. *See, Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453 (3d Cir. 1982).