Steve V.B. KELLER

v.

UNITED STATES of America, owner of the Arthur M. Huddell, a United States Ship registered in Jacksonville, Florida; Simplex Wire & Cable Co.

Civ. No. 81–549–D.

United States District Court, D. New Hampshire.

Feb. 24, 1983.

Michael J. Donahue, Exeter, N.H., Douglas S. Carr, Philip C. Hunt, Dennett H. Buettner, Portland, Me., for plaintiff.

Stephen J. Dibble, Dover, N.H., Robert F. Hanson, Portland, Me., for Simplex.

Helen J. Forsyth, Asst. U.S. Atty., for U.S.

## OPINION AND ORDER

DEVINE, Chief Judge.

Plaintiff was injured on November 5, 1979, while employed by defendant Simplex Wire & Cable Co. ("Simplex") at its Newington, New Hampshire, riverside facility. He was injured while working aboard a vessel, The Arthur M. Huddell ("The Huddell"), which was loading cable at Simplex's pier. Plaintiff fell from a ladder in a cargo hold of the vessel and was seriously injured.

This action is brought in admiralty. The Court's jurisdiction is founded upon 28 U.S.C. §§ 1331, 1332, and 1333. The various causes of action are brought pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741, *et seq.*, and the Longshoreman and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, *et seq.*

### Background

Plaintiff filed his four-count complaint in this court on November 4, 1981, naming as defendants the United States of America and Simplex.[1] Count I alleges that the

---

1. The United States is the owner of The Huddell, a United States ship registered in Jacksonville, Florida, and Simplex is a Massachusetts corporation with a place of business in Newington, New Hampshire. Plaintiff is a New Hampshire resident.

United States is liable for the unseaworthy condition of the vessel which caused plaintiff's injury. Count II alleges that Simplex is liable for the unseaworthy condition of the vessel which caused plaintiff's injury. Count III alleges that the negligence of the United States caused plaintiff's injury. Count IV alleges that the negligence of Simplex caused plaintiff's injury. Plaintiff seeks money damages and requests trial by jury on all issues.

The United States defends on the ground, among others, that plaintiff under 33 U.S.C. § 933(b) lacks standing[2] and that the United States breached no duty, if any owed, to plaintiff.

The United States filed its motion for summary judgment and memorandum of law. It argues that plaintiff's action is barred by his acceptance of workers' compensation pursuant to 33 U.S.C. § 933(b). The United States further alleges that plaintiff's complaint fails to state a claim against the United States because the owner of a vessel is not liable for injury caused by a negligent stevedore and that the liability of the vessel to a longshoreman injured while loading a ship cannot be based upon unseaworthiness.

Simplex answered the complaint. It defends on the grounds that Simplex is not a "vessel" within the meaning of 33 U.S.C. § 905(b), i.e., under 33 U.S.C. § 902(21), which defines "vessel", and that Simplex is not the owner *pro hac vice,* agent, operator, charter, bareboat charterer, master, officer, or crew member of The Huddell. Simplex further claims that plaintiff lacks standing under 33 U.S.C. § 933(b).

2. Defendant claims that pursuant to 33 U.S.C. § 933(b) plaintiff accepted workers' compensation, failed to bring this action within six months of acceptance, and therefore assigned his right of action, as a matter of law, to his employer, Simplex.

3. Simplex also alleges that its exclusive liability to plaintiff was payment of workers' compensation. Assuming *arguendo* that it was a vessel, Simplex also alleges that an employer who pays workers' compensation and who is also a "vessel" is not liable in negligence as a vessel, and that plaintiff has no cause of action for unseaworthiness against Simplex since plaintiff

Simplex filed its motion for summary judgment and memorandum of law on July 1, 1982. Simplex argues that it is not liable under 33 U.S.C. § 905(b) since Simplex was not the owner *pro hac vice,* operator, charterer, or agent of The Huddell.[3] Plaintiff objected and filed his memorandum of law. Simplex filed a reply memorandum.[4]

*Summary Judgment Standards*

Summary judgment is proper solely when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Condon v. Local 2944, United Steelworkers of America,* 683 F.2d 590, 594 (1st Cir.1982). A dispute of fact is material when it affects the outcome of the litigation, and is genuine if made manifest by substantial evidence going beyond the allegations of the complaint. *Pignons S.A. de Mecanique de Precision v. Polaroid Corporation,* 657 F.2d 482, 486 (1st Cir.1981). In filing their motions for summary judgment, Simplex and the United States assume the burden of demonstrating that there is no genuine issue of material fact. *White v. Hearst Corporation,* 669 F.2d 14, 17 (1st Cir.1982); *see also Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977). The Court must look at the evidence in the light most favorable to, and indulge all inferences in favor of, the party opposing the motion. *Packish v. McMurtie,* 697 F.2d 23, 26 (1st Cir.1983) (per curiam).

is not a seaman or crew member. In view of the result reached in this Opinion and Order, the Court need not reach these issues as to Simplex.

4. In light of this Opinion and Order, the Court need not address plaintiff's assertion that Simplex is estopped from raising a defense under 33 U.S.C. § 933(b) "at this late stage of the summary judgment proceeding, [Simplex] having not relied upon [the defense] in its initial memorandum", Plaintiff's Reply Memorandum to Reply Memorandum of Simplex, p. 5, since the issue is addressed by the United States and analyzed as such preliminarily by the Court.

*Motions by the United States*

*33 U.S.C. § 933(b)*

The United States contends that plaintiff's action is barred by 33 U.S.C. § 933(b)[5] because he accepted workers' compensation, did not bring this action within six months of acceptance, and consequently assigned his rights of action to his employer, Simplex.

The facts are not in dispute. The pertinent facts are found in the Affidavit of Steve V.B. Keller, and Relevant Additional Filings [by the United States] from the Plaintiff's Longshoremen's and Harbor Workers' Compensation Act claim file.

Plaintiff was injured on November 5, 1979. He was comatose for about one week and hospitalized for about five weeks. Subsequent to plaintiff's injury, Simplex completed U.S. Department of Labor ("DOL") Form LS–202, Employer's First Report of Injury or Occupational Illness. The form was apparently received on November 9, 1979, by the DOL Office of Workers' Compensation Programs ("OWCP"). Simplex's workers' compensation insurance carrier, Aetna, paid disability benefits to plaintiff. Compensation was paid from the date of injury. The first payment date was November 11, 1979. Neither plaintiff nor his representatives initially either requested or refused the payments. On December 5, 1979, plaintiff by his attorneys notified DOL that pursuant to 33 U.S.C. § 912 Simplex had been given notice of plaintiff's injury and claim under the LHWCA. The letter expressed plaintiff's understanding that Aetna was presently making compensation payments to plaintiff. Plaintiff was discharged from the hospital on December 12, 1979. He subsequently filed Form LS–203, Employee's Claim of Compensation, with DOL. Aetna filed a Form LS–206, Payment of Compensation Without Award,

on April 13, 1980. Aetna and Simplex by their attorneys filed Form LS–215, Answer to Claim for Compensation. The parties held an informal conference at DOL on March 31, 1982. OWCP issued a Memorandum of Informal Conference, LS–280, on April 28, 1982, and ordered that Simplex and Aetna "pay the claimant for a period of permanent total disability from 11–5–79 to date [4–28–82] & continuing". Relevant Additional Filings, Exhibit 6–2.

Under 33 U.S.C. § 933(b), an administrative order for benefits operates as an assignment to the stevedore-employer of the longshoreman's rights against the third party unless the longshoreman sues within six months. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 269, 99 S.Ct. 2753, 2760, 61 L.Ed.2d 521 (1979). The United States claims that because plaintiff received compensation payments from November 11, 1979, five days after the accident, this action, filed on November 4, 1981, more than six months after the payment and acceptance of benefits, is barred by 33 U.S.C. § 933(b).

Only two Circuit Courts have addressed the issue of when the six-month period begins, i.e., when an acceptance of compensation under an award takes place. The courts take markedly different approaches. *Compare Verderame v. Torm Lines*, 670 F.2d 5 (2d Cir.1982) ("*Verderame*"); *D'Amico v. Cia de Nav. Mar. Netumar*, 677 F.2d 249 (2d Cir.1982) ("*D'Amico*") with *Simmons v. Sea-Land Services, Inc.*, 676 F.2d 106 (4th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 242, 74 L.Ed.2d 190 (1982) ("*Simmons*").[6] The United States Court of Appeals for the First Circuit and the district courts within the Circuit have referred to 33 U.S.C. § 933(b), *see, e.g., Cella v. Partenreederei MS Ravenna*, 529 F.2d 15, 18 (1st Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct.

---

5. 33 U.S.C. § 933(b) states:

 Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner or Board shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person

unless such person shall commence an action against such third person within six months after such award.

6. Justice White, with whom Justice O'Connor joined, dissented from the denial of certiorari. "I would grant certiorari in order to resolve the conflict." *Id.*

2175, 48 L.Ed.2d 799 (1976); *United States Lines Company v. Jarka Corporation of New England,* 265 F.Supp. 811, 814 (D.Mass.), *modified* 387 F.2d 436 (1st Cir. 1967); *Castro v. United States,* 230 F.Supp. 967, 968 (D.P.R.1964), but have not faced the issue of when the six-month period begins. The Second Circuit holds that acceptance of compensation under an award does not occur "until the amount of compensation benefits to be received by the injured longshoreman is fixed, either by order, stipulation of the parties, or informal award". *Verderame, supra,* 670 F.2d at 7. The Fourth Circuit holds that " 'an award in a compensation order' is created by the completion of three events: (1) the employer,

having not contravened its liability, initiates compensation payments to the longshoreman; (2) the deputy commissioner [DOL] files the employer's notice that compensation payments have been initiated; and (3) the longshoreman accepts any of the payments". *Simmons, supra,* 676 F.2d at 109. Upon careful review of the judicial interpretations of the statute,[7] and the statute's legislative history,[8] the Court finds that plaintiff's action is not barred.

The dominant intent of Congress in enacting the LHWCA was to help longshoremen. *Reed v. The Yaka,* 373 U.S. 410, 415, 83 S.Ct. 1349, 1353, 10 L.Ed.2d 448 (1963). Congress knew that longshoring is danger-

**7.** The following decisions, all from courts of the Fourth Circuit, are consistent with the *Simmons* view. *Caldwell v. Ogden Sea Transport, Inc.,* 618 F.2d 1037 (4th Cir.1980), *criticized on other grounds, Rodriguez v. Compass Shipping Co., Ltd.,* 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981); *Liberty Mutual Insurance Company v. Ameta & Company,* 564 F.2d 1097 (4th Cir.1977); *Collins v. Norfolk Shipbuilding & Drydock Corporation,* 522 F.Supp. 1211 (E.D. Va.1981); *Oman v. Johns Manville Corp.,* 482 F.Supp. 1060 (E.D.Va.1980), *aff'd* 662 F.2d 243 (4th Cir.1981); *Larson v. Associated Container Transportation (Australia) Ltd.,* 459 F.Supp. 561 (E.D.Va.1978). Other decisions are consistent with the Second Circuit view. *D'Amico, supra; Verderame, supra; Kirsch v. Bangladesh Shipping Corp.,* 544 F.Supp. 83 (E.D.Pa. 1982); *Rother v. Interstate and Ocean Transport Company,* 540 F.Supp. 477 (E.D.Pa.1982); *Klitznsky v. Pakistan Shipping Corporation,* 530 F.Supp. 326 (E.D.Pa.1981); *Theodore v. Moore McCormack Lines, Inc.,* 516 F.Supp. 25 (S.D.N.Y.1981); *Dunbar v. Retla Steamship Company,* 484 F.Supp. 1308 (E.D.Pa.1980); *DeMonte v. Shipping Corp. of India, Ltd.,* 476 F.Supp. 392 (S.D.N.Y.1979); *Sea Quest Marine, Inc. v. Cove Shipping, Inc.,* 474 F.Supp. 164 (W.D.Wash.1979); *cf. Rhodes v. Donohoe Construction Company,* 527 F.Supp. 596 (D.D.C. 1981); *Collier v. John Mendis, Inc.,* 526 F.Supp. 459 (D.D.C.1981); *Fearson v. Johns-Manville Sales Corporation,* 525 F.Supp. 671 (D.D.C. 1981) (all refer to 33 U.S.C. § 933(b) of the LHWCA as adopted by the District of Columbia as its workers' compensation law).

**8.** The LHWCA became effective March 4, 1927. The original 33 U.S.C. § 933(b) provided:

Acceptance of such compensation shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person, whether or not the person entitled to

compensation has notified the deputy commissioner of his election.

44 Stat. 1440. The employee's election to accept compensation effected an immediate assignment to his employer of his cause of action for negligence. *Rodriguez v. Compass Shipping Co., Ltd.,* 451 U.S. 596, 604, 101 S.Ct. 1945, 1950, 68 L.Ed.2d 472 (1981) ("*Rodriguez*"). 33 U.S.C. § 933(b) was amended in 1938 and stated:

Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person.

52 Stat. 1168. The amendment provided that acceptance of compensation would operate as an assignment only if the payment was "under an award in a compensation order filed by the deputy commissioner". This change protected the employee who improvidently accepted compensation from the harsh consequence of automatic assignment. *Rodriguez, supra,* 451 U.S. at 605, 101 S.Ct. at 1951. In 1959, the statute was again amended.

Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner shall operate as an assignment to the employer of all rights of the person entitled to compensation to recover damages against such third person unless such person shall commence an action against such person within six months after such award.

73 Stat. 391. The amendment postponed the assignment by operation of law until six months after the acceptance of compensation under an award. *Rodriguez, supra,* 451 U.S. at 610, 101 S.Ct. at 1954. The 1972 amendments did not substantially change the provisions of this section. *Cella v. Partenreederei MS Ravenna, supra,* 529 F.2d at 18, n. 3.

ous.[9] The legislative history of the LHWCA, *e.g.,* 33 U.S.C. § 933(b), *supra,* reflects the vigilant concern by Congress that the longshoreman be protected. In order to advance the intent of Congress, the Court has found that the LHWCA "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results". *Reed v. The Yaka, supra, quoting Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953).

In view of the legislative history and purpose of the Act, *see generally Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates,* —— U.S. ——, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983) ("*Perini*"), the Court concludes that although a formal award under a compensation order may not be required, *see Simmons, supra,* 676 F.2d at 109, what should be required in keeping with the Second Circuit view is that the amount of compensation benefits to be received by the injured worker be fixed, by order, stipulation of the parties, or informal award. *See Verderame, supra,* 670 F.2d at 7. The employee should first understand the nature and extent of his injuries in order to establish how much compensation he will receive. *Id.* Here, plaintiff was hospitalized and possibly comatose when he first received compensation. He was not aware of the full nature and extent of his injuries. In fact, as late as December 19, 1980, Simplex and Aetna noted on Form LS–215, Answer to Claim for Compensation, that the "[e]mployee has not reached an end result". Relevant Additional Filings, Exhibit 6–1. Plaintiff states that he is not aware of the full nature and extent of his injuries. Affidavit of Steve V.B. Keller, ¶¶ 8, 9. There is also no evidence that plaintiff is aware of the total amount of compensation payments to be received by him.

A legitimate concern of those following the Fourth Circuit view is what happens when the employee chooses not to bring a third-party action.

If the employee chooses not to seek recovery from third parties, no direct action will be immediately available to the employer. If the employer is disturbed by the hesitance of its injured employee to initiate suit against the charterer or shipowner, it may, by pressing a formal award, force the employee to commence such action or forfeit control of the litigation. Once there has been an assignment to the employer, however, the employee may be irretrievably denied a tort recovery by the inaction of a reluctant assignee.

*Dunbar v. Retla Steamship Company, supra,* 484 F.Supp. at 1311, n. 4.

■ There has been no formal entry of award. Compensation has been partial and interim. Total compensation has not been agreed upon. Under these circumstances, there has been no acceptance of compensation under an award, and the assignment provision of 33 U.S.C. § 933(b) does not operate to bar plaintiff's action. *Verderame, supra.*

### Liability of the United States as Shipowner

■ Defendant moves for summary judgment for plaintiff's failure to state a claim against the United States upon which relief can be granted on the grounds that the United States is not liable to a longshoreman for the negligence of the stevedore/employer, has no duty to inspect or supervise cargo operations, and cannot be liable to plaintiff for the alleged unseaworthiness of the vessel. Defendant relies on the Memorandum of Law filed by Simplex and the affidavit of Maurice S. Aiken. If on a motion asserting the defense for failure to state a claim upon which relief can be granted matters outside the pleadings are considered by the Court, the motion shall be treated as one for summary judgment. Rule 12(b), Fed.R.Civ.P. Plaintiff has filed a Memorandum of Law in Opposition to Defendant United States' Motion for Summary Judgment and is aware

---

**9.** As of 1972, coal mining was the only vocation more dangerous than longshoring. *Johnson v.*

*A/S Ivarans Rederi,* 613 F.2d 334, 339, n. 5 (1st Cir.1980).

of the present proceeding. *See Condon v. Local 2944, United Steelworkers of America, supra.*

■ The United States contends that *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) ("*Scindia*"), and 33 U.S.C. § 905(b) [10] support the proposition that a shipowner is not liable to a longshoreman for the negligence of the stevedore/employer. Regardless of the questionable relevance of *Scindia* to this contention, the issue is not whether the United States is liable to plaintiff for the negligence of Simplex, but is whether the United States is liable for its own negligence. *Scindia* does not foreclose all liability of a negligent shipowner to a longshoreman. It is true that a shipowner cannot be charged with the negligence of the stevedore or longshoreman. A negligent shipowner's liability, however, may be reduced but is not eliminated by the negligence of the stevedore or longshoreman. *Subingsubing v. Reardon Smith Line, Ltd.,* 682 F.2d 779, 780 (9th Cir.1982). A shipowner remains liable for his own negligence. 33 U.S.C. § 905(b).

■ Inspection and supervision of the cargo operations are material to the determination of liability. Only absent contract provision, positive law, or custom to the contrary does the shipowner have no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. *Scindia, supra,* 451 U.S. at 172, 101 S.Ct. at 1624. There is disagreement whether the United States supervised or inspected the cargo operations. Curtis N. Hambrick of the Navy avers that he did not supervise or direct cable loading by Simplex employees. Affidavit of Curtis N. Hambrick, ¶ 7. By contrast, however, Maurice S. Aiken of Simplex avers that storage of cable was in accordance with directives drafted by Western Electric and that the Navy and Western Electric inspected the ship and its cargo of cable on many occasions. Affidavit of Maurice S. Aiken, ¶¶ 7–8. The Navy allegedly employed Western Electric as an additional contractor and agent to develop the directives. Memorandum of Law of Plaintiff in Opposition to United States' Motion for Summary Judgment, p. 4. The directives, "6200 Project Cable Loading and Testing Requirements for Arthur M. Huddell", are twenty-eight pages long. *See* Affidavit of Maurice S. Aiken, Exhibits C–1 to C–27. The directives include, *inter alia,* cable loading, cable testing, and cable identification procedures. Exhibit C–2. Cable loading procedures note that "[a]ll cable handling personnel shall wear protective foot coverings when coiling down cable". Exhibit C–3, ¶ 1.1.6. "No smoking, eating or drinking of any kind shall be permitted in the cable tanks or adjoining areas at any time." Exhibit C–3, ¶ 1.1.7. Cable loading sequence was predetermined. Exhibit C–4, ¶ 1.4. Simplex cable testers were to follow explicit cable testing procedures "[u]pon receipt of each cable and aboard . . . ." Exhibit C–13, ¶ 2.1.1.

■ The affidavits of Hambrick and Aiken demonstrate that there exists a genuine

---

**10.** 33 U.S.C. § 905(b) states:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

issue of material fact as to supervision or inspection. Defendant has failed to meet its burden of demonstrating that there is no genuine issue of material fact. *White v. Hearst Corporation, supra,* 669 F.2d at 17. Consequently, summary judgment must be denied.

The United States also contends that a shipowner is not liable to a longshoreman for the unseaworthiness of the vessel. *See* 33 U.S.C. § 905(b) ("The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Chapter.") The warranty of seaworthiness, a sort of seabound strict liability, traditionally extended to crew members. After *Seas Shipping Co., Inc. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), however, a longshoreman injured while loading or unloading a ship could receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence. The 1972 amendments to the LHWCA abolished the longshoreman's right to recover for unseaworthiness. *Perini, supra,* 103 S.Ct. at 645; *Scindia, supra,* 451 U.S. at 165, 101 S.Ct. at 1620. *Johnson v. A/S Ivarans Rederi, supra,* 613 F.2d at 341; *Burks v. American River Transportation Company,* 679 F.2d 69, 76 (5th Cir.1982) ("*Burks*"); *Normile v. Maritime Company of the Philippines,* 643 F.2d 1380, 1382 (9th Cir.1981).

 Plaintiff admits that while employed by Simplex he performed "longshoremen and stevedore functions on board the United States ship the Arthur M. Huddell by loading cable into the holds of the Huddell". Amended Responses of Plaintiff to Simplex's Requests for Admissions, p. 1. The United States relies on the Memorandum of Law filed by Simplex wherein it alleges

11. *See generally Generaly Dynamics Corporation v. Sacchetti,* 681 F.2d 37, 38 (1st Cir.1982) ("employees" covered by LHWCA).

12. If there is any doubt, the word "and" includes the owner *pro hac vice,* charter, or bareboat charterer in the definition of "vessel". *Swans v. United States Lines, Inc.,* 407 F.Supp. 388, 393 (E.D.Pa.1975).

that plaintiff's admission, *supra,* and the fact that plaintiff has filed a claim for and received compensation payments under the LHWCA, negate any suggestion by plaintiff that he was a crew member. Plaintiff also alleges, however, that he was serving as a member of the crew.[11] Amended Answers of Plaintiff to Simplex's First Set of Interrogatories, p. 4. The United States denies that plaintiff was a crew member, but offers no proof other than plaintiff's allegedly inconsistent statements. The question of whether someone is a member of the crew is one ordinarily left to the trier of fact. *Duncanson-Harrelson Company v. Director Office of Workers' Compensation Programs, United States Department of Labor,* 686 F.2d 1336, 1340 (9th Cir.1982); *Burks, supra,* 679 F.2d at 76; *Searcy v. E.T. Slider, Incorporated,* 679 F.2d 614, 616 (6th Cir.1982) (per curiam); *see also* 10A Wright, Miller & Kane, Federal Practice and Procedure § 2729 (1983). The Court cannot rule that plaintiff, who alleges he is a crew member, cannot recover under the warranty of seaworthiness.

*Motion by Simplex*

Simplex moves for summary judgment on the ground that it is not liable under 33 U.S.C. § 905(b) because it is not a "vessel". The liability of the vessel is defined at 33 U.S.C. § 905(b). "Vessel" is defined at 33 U.S.C. § 902(21):

The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.[12]

Vessel would be defined as any vessel upon which or in connection with which any person entitled to benefits suffers injury and including the vessel owner and others responsible for the operation of the vessel. 1972 U.S.Code Cong. & Ad.News 4698, 4719. No construction of this statute would differen-

Simplex alleges that it is not the owner *pro hac vice* of The Huddell.[13]

*The Law of Charter Parties* [14]

The owner *pro hac vice* is usually the charterer. *See Griffith, supra;* 33 U.S.C. § 902(21). Charter parties are generally divided into two categories: demise charters and charters of affreightment. *Interocean Shipping Co. v. M/V Lygaria,* 512 F.Supp. 960, 964 (D.Md.1981). A demise charter is also known as a bareboat charter. *Id.* "The vessel is chartered or 'leased' to another who takes possession, custody and control of the vessel. The owner surrenders entire control and possession of the vessel and subsequent control over its navigation to the bareboat charterer, who becomes the owner *pro hac vice.*" *Norris, The Law of Maritime Personal Injuries* 215 (1959).

The other basic type of charter, an affreightment, is subdivided into voyage charters and time charters. *Id.* Under a time charter, "[t]he vessel is chartered or 'leased' to the charterer for a fixed period of time. Custody and control remains with the vessel owner. [The voyage charter] is similar in all respects to the time charter, except that the ship is hired for a single voyage." *Id.* at 216.

The basic difference then between the demise charter and the contract of affreightment is that the former shifts possession and control from the owner to the charterer. The demise charterer becomes, in effect, the owner *pro hac vice. Marr Enterprises, Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 957 (9th Cir.1977). Congress effectively precluded voyage and time charterers from liability as a vessel by the use

of the phrase "charter or bareboat charterer". *Meredith v. A & P Boat Rentals, Inc.,* 414 F.Supp. 788, 791 (E.D.La.1976). Simplex must be shown to be the demise charterer, hence the owner *pro hac vice,* to incur liability as a vessel and shipowner.

*Ownership Pro Hac Vice*

It has been long recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the vessel's owner, *Leary v. United States,* 81 U.S. (14 Wall.) 607, 610, 20 L.Ed. 756 (1872) ("*Leary*"); *United States v. Shea,* 152 U.S. 178, 186, 14 S.Ct. 519, 521, 38 L.Ed. 403 (1894) ("*Shea*"), generally called the owner *pro hac vice, Reed v. The Yaka, supra,* 373 U.S. at 412, 83 S.Ct. at 1351. The bareboat or demise charterer stands liable *in personam* as the owner would, *see Lopez v. Atlanta-Schiffahrts-G.M.B.H.,* 259 F.Supp. 949, 950 (D.P.R.1966), and acquires the character and becomes subject to the legal duties and responsibilities of ownership, *A & S Transportation Co., Inc. v. Tug Fajardo,* 688 F.2d 1, 3 (1st Cir.1982); *Leary, supra,* 81 U.S. (14 Wall.) at 610; *Reed v. United States,* 78 U.S. (11 Wall.) 591, 600, 20 L.Ed. 220 (1870) ("*Reed*"); *see generally* 2B Benedict on Admiralty § 51, *et seq.* (7th ed. 1982). The law in this country is that the ship itself is to be treated in some sense as a principal, and as personally liable for the negligence of anyone who is lawfully in possession of her, whether as owner or charterer. *The Barnstable,* 181 U.S. 464, 467, 21 S.Ct. 684, 685, 45 L.Ed. 954 (1901).

*Presumption Against Transfer of Ownership*

Courts generally presume that the owner does not mean to put his vessel into the

---

tiate an owner *pro hac vice* from an owner, a charter, an agent, or a master. *Griffith v. Wheeling Pittsburgh Steel Corporation,* 521 F.2d 31, 41 (3d Cir.), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1975), *appeal after remand,* 610 F.2d 116 (1979), *vacated on other grounds sub nom., American Commercial Lines, Inc. v. Griffith,* 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981) ("*Griffith*").

**13.** The phrase *"pro hac vice"* means literally "for this turn" or "for this one particular occasion". *Black's Law Dictionary* 1091 (5th ed. 1979).

**14.** A charter party is a contract by which a ship or some other principal part thereof is let to a merchant for the conveyance of goods on a determined voyage to one or more places. The term "charter party", often shortened to "charter", designates the document in which are set forth the arrangements and contractual engagements entered into when one person (the "charterer") takes over the use of the whole of a ship belonging to another (the "owner"). *Black's Law Dictionary* 214 (5th ed. 1979).

possession of the charterer. *Reed, supra,* 78 U.S. (11 Wall.) at 601; *Hansen v. E.I. du-Pont de Nemours & Co.,* 33 F.2d 94, 96 (2d Cir.), *cert. denied,* 280 U.S. 589, 50 S.Ct. 37, 74 L.Ed. 638 (1929); *Fitzgerald v. A.L. Burbank & Co.,* 451 F.2d 670, 676 (2d Cir.1971) (*"Fitzgerald"*); *see also Stephenson v. Star-Kist Caribe, Inc.,* 598 F.2d 676, 680 (1st Cir.1979) (*"Stephenson"*). This presumption places a heavy burden on the party who attempts to show that the owner of the vessel has been relieved of his legal obligations flowing to him as owner. *Guzman v. Pichirilo,* 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962) (*"Guzman"*); *Fitzgerald, supra,* 451 F.2d at 676. Courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship. *Guzman, supra,* 369 U.S. at 700, 82 S.Ct. at 1096.

The rationale behind the presumption against *pro hac vice* ownership is to avoid placing the liabilities of an owner upon the unwitting charterer. *See* Gilmore and Black, *The Law of Admiralty* 242 (1975). The owner may find it efficacious to allege that the charterer was the owner *pro hac vice* and thus rely upon the usual presumption that damage to the chartered vessel was occasioned by the negligence of the charterer. *B.W. King, Inc. v. Consolidated Iron & Metal Co.,* 310 F.Supp. 471 (S.D.N.Y. 1970) (*"King"*); *see also Annot.,* 14 A.L.R. Fed. 544, 592 (1973). So, too, under a time and voyage charter, the obligation to maintain the seaworthiness of the vessel remains with the vessel owner, whereas under a demise charter, the vessel must be seaworthy at the commencement of the charter period, but the owner generally has no maintenance responsibilities. *Interocean Shipping Co. v. M/V Lygaria, supra,* 512 F.Supp. at 964; *but see Vitozi v. Balboa Shipping Co.,* 163 F.2d 286, 289 (1st Cir. 1947) ("Certainly if under federal law a demise charter party casts the duties and responsibilities of ownership upon the charterer, under federal law it must cast upon him the duty and responsibility to see to it that the vessel is seaworthy during the term of the charter, even though it may not have been seaworthy at the time when the charter was entered into.").

Although the Court is aware of the presumption against transfer of ownership, the Court does not rely on this presumption. First, the rationale for the presumption is inapposite to this situation where the owner does not seek to impress ownership status and liabilities upon a supposed demise charterer. Second, defendant movant assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact. This is so even though as a defendant he would have no burden at trial. *Mack v. Cape Elizabeth School Board, supra,* 553 F.2d at 722, *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

*Written Charter Agreements*

 The Court does not have before it a formal or written charter agreement. The relationship of the Navy and Simplex to The Huddell is set forth in memoranda and instructions. Affidavit of Maurice Aiken, Exhibits B, B–2; Affidavit of Curtis Hambrick, Attachment No. 2; Documents Produced by the United States, Exhibits 4–4, 4–5, 4–20 to 4–22. There is no statute of frauds in admiralty, however, so a charter may be oral and yet be enforceable, regardless of state law. *See Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Union Fish Co. v. Erickson,* 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261 (1919); *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.,* 681 F.2d 121, 124 (2d Cir.1982); *see generally* Zock, *Charter Parties in Relation to Cargo,* 45 Tulane L.Rev. 733 (1971). When there is no evidence that an express agreement of charter or other arrangement for use of the barge exists, a charter party and ownership *pro hac vice* may be implied from circumstances concerning the actual possession and use of the vessel. *See St. Paul Fire & Marine Insurance Company v. Vest Transportation Company, Inc.,* 500 F.Supp. 1365, 1372 (N.D. Miss.1980), *aff'd* 666 F.2d 932 (5th Cir.1982); *but see King, supra,* 310 F.Supp. at 474, n. 27 (doubtful if a true demise charter can be entered into except in writing). No formal language is necessary to create a demise

charter. *Shea, supra,* 152 U.S. at 189, 14 S.Ct. at 522.

The Court very briefly restates the facts that are not in dispute. Simplex contracted to sell and the Navy to buy underwater cable. The Huddell was brought to Simplex's riverside facility at Newington, New Hampshire, to be loaded with cable. The vessel remained at Simplex for nearly two years while Simplex employees loaded cable on board. Tugboats and pilots of Portsmouth Pilots and Portsmouth Navigation ("PPN") shuttled the vessel back and forth between Simplex's pier and The Huddell's river mooring. The laden vessel departed Simplex and was towed out to sea by the Navy.

Whether Simplex is the owner *pro hac vice* of the vessel, The Huddell, rests on whether Simplex is the demise charterer of The Huddell. To create a demise, the owner of the vessel, the United States, must completely and exclusively relinquish possession, command, and navigation thereof to the demisee, Simplex. *Guzman, supra,* 369 U.S. at 699, 82 S.Ct. at 1096; *Shea, supra,* 152 U.S. at 189, 14 S.Ct. at 522; *Leary, supra,* 81 U.S. (14 Wall.) at 611; *Reed, supra,* 78 U.S. (11 Wall.) at 600. The relinquishment of possession, command, and navigation is tantamount to, though just short of, an outright transfer of ownership. *Guzman, supra,* 369 U.S. at 700, 82 S.Ct. at 1096. Unless the ship herself is let to hire, and the owner parts with possession *and* command *and* navigation, the charterer is not to be regarded as the owner. *Reed, supra,* 78 U.S. (11 Wall.) at 591.

■ As to possession, plaintiff asserts that Simplex, for its own commercial purposes, used the vessel as a floating warehouse for cable already purchased by the United States. Plaintiff's Memorandum of Law in Opposition to Simplex's Motion for Summary Judgment, p. 37. A demise char-

terer has the right to use the vessel for his own commercial enterprises. *See Ducote v. International Operating Co. of La., Inc.,* 678 F.2d 543 (5th Cir.1982) ("*Ducote*"); *Bossard v. Port Allen Marine Service, Inc.,* 624 F.2d 671 (5th Cir.1980); *Bernier v. Johns-Manville Sales Corp.,* 547 F.Supp. 389 (D.Me. 1982) ("*Bernier*"); *Olsen v. Todd Shipyards Corporation,* 435 F.Supp. 568 (W.D.Wash. 1977) ("*Olsen*"). He has the right to use the vessel to carry his own cargo. *See Griffith, supra; Eskine v. United Barge Company,* 484 F.2d 1194 (5th Cir.1973); *Blair, supra; see also The Frank A. Smith,* 8 F.Supp. 134 (E.D.N.Y.1934). Limitations on such rights are not consistent with ownership *pro hac vice. See Bailey v. Johns-Manville Corp.,* Civil No. 76–155–NN (E.D.Va. Feb. 12, 1982). The only purpose for which the Navy authorized the presence of Simplex employees aboard The Huddell was to store cable in the vessel's holds and to perform other tasks incidental to cable storage. Affidavit of Maurice S. Aiken, ¶ 6. All cable placed aboard The Huddell was the property of the United States. *Id.* at ¶ 7. A demise charter cannot contain such a limitation over possession. *Guzman, supra.*

■ Plaintiff asserts that Simplex crewed The Huddell and thereby controlled the vessel. "Authority over the manning of a vessel is an important determinant whether it is the owner or charterer who exercises control...." *Stephenson, supra,* 598 F.2d at 680. Under a typical demise charter, the ship is directed by the charterer's master and manned by his crew. *Reed v. The Yaka, supra,* 373 U.S. at 412, 83 S.Ct. at 1351. The master and crew are the charterer's men. *Bergan v. International Freighting Corp.,* 254 F.2d 231, 232 (2d Cir.1958); Gilmore and Black, *The Law of Admiralty* 170–71 (1975). The Huddell, however, is a barge: a vessel without motive power.[15]

---

**15.** The vessel's description as a barge is legally significant since its nature often determines the terms of the charter. *Willamette-Western Corp. v. Columbia Pacific Towing Company,* 466 F.2d 1390, 1392 (9th Cir.1972). The Huddell originally was built during World War II as a Liberty Ship. She is over 440 feet long, 56 feet wide, and displaces over 7,000 gross tons. Her rounded cargo holds were used to carry flexible pipe laid under the English Channel during the Allied invasion of Normandy. Private corporations chartered her as a cable car-

Unlike a vessel with motive power that is commanded by a master, vessels without motive power are essentially subject to the control and direction of the tug that tows them. *Ira S. Bushey & Sons v. W.E. Hedger & Co.*, 40 F.2d 417, 418 (2d Cir.1930); *see also Griffith, supra; Blair, supra* (barge subject to control of charterer whose employees maneuver vessel without use of motor powered vessel). Responsibility for some incidental movement of the vessel does not of itself create the ownership-like relationship with the vessel necessary to establish ownership *pro hac vice. Ducote, supra,* 678 F.2d at 546.

The Navy, by its Military Sealift Command, towed The Huddell to Portsmouth (New Hampshire) Harbor. PPN met her at the mouth of the harbor and piloted and towed her to Simplex. PPN pilots and tugboats shifted The Huddell many times between her river mooring and Simplex's pier. PPN eventually brought the laden vessel to the mouth of the harbor where she was towed away by the Navy. Although PPN at all times acted at the request of Simplex, Affidavit of Shirley H. Holt III, ¶ 17, Simplex had no authority to hire PPN to move The Huddell for any purposes other than those related to cable loading operations. Affidavit of Maurice S. Aiken, ¶ 10. All movements required advance notice and consent of the Navy. Documents Produced by the United States, Exhibit 4–21. A demise charter does not exist under such restrictions of command. *Guzman, supra.*

■ Charters of barges without motive power accompanied by a bargeman, i.e., a master of the barge paid by the owner, may be demises. *See, e.g., The R. Lenahan, Jr.,* 48 F.2d 110 (2d Cir.), *cert. denied,* 284 U.S. 629, 52 S.Ct. 13, 76 L.Ed. 536 (1931); *Ira S.*

*Bushey & Sons v. Hedger & Co., supra; Dailey v. Carroll,* 248 F. 466 (2d Cir.1917); *The Nat E. Sutton,* 42 F.2d 229 (E.D.N.Y. 1930), *modified and aff'd,* 62 F.2d 787 (2d Cir.), *modified on reh'g,* 63 F.2d 1021 (1933); *Moran Towing v. City of New York,* 36 F.2d 417 (S.D.N.Y.1929); *The Daniel Burns,* 52 F. 159 (S.D.N.Y.1892), *aff'd* 56 F. 605 (2d Cir.1893).[16] In these cases, however, the barges were chartered to parties who towed the vessel away and utilized it in their businesses between destinations unknown to the owners. *King, supra,* 310 F.Supp. at 474. The lines connecting The Huddell to the pier or mooring, however, were never disconnected during the period the barge was being loaded. Answers by the United States to Plaintiff's Interrogatories, ¶ 2. The Huddell was moved only to shift position within the mooring for the purpose of aligning cargo holds for taking on cable and to allow docking of other visiting cable ships. *Id.* at ¶ 6. The only movements of The Huddell while at Simplex were back and forth between her mooring upon the Piscataqua River and Simplex's loading pier, a distance of approximately four hundred feet. Affidavit of Maurice S. Aiken, ¶ 10. Simplex's limited control over navigation does not constitute the control required as a matter of law to establish ownership *pro hac vice.*

■ The relationship of Simplex to The Huddell resembles the relationship of stevedore to shipowner. The relationship of stevedore to shipowner is different from that of bareboat charterer to shipowner. *Rao v. Hillman Barge & Construction Company,* 467 F.2d 1276 (3d Cir.1972); *see also Bailey v. Johns-Manville Corp., supra; Smith v. Standard Fruit and Steamship Company,* 324 F.Supp. 420 (S.D.N.Y.1971).

rier in the 1950's. Documents Produced by Simplex in Response to Plaintiff's Request for Production, Exhibits 5–5 and 5–6. In 1977 the Navy towed The Huddell to drydock and rigged her as a barge. She was then towed by the Navy to New Jersey from California and refurbished to facilitate cable loading and storage. Affidavit of Curtis N. Hambrick, ¶ 8. The Huddell is a "dead" ship, i.e., without propulsion of her own. Affidavit of Shirley H. Holt III, ¶ 8; Affidavit of Maurice S. Aiken, ¶ 3. (Not to be

confused with the so-called "dead vessel" doctrine, where a vessel permanently withdrawn from use for navigational purposes is not a vessel in terms of admiralty jurisdiction. *See Hercules Co. v. The Brigadier General Absolom Baird,* 214 F.2d 66, 68 [3d Cir.1954] ).

**16.** These charters are sometimes referred to as "New York Harbor charters". *Annot.,* 14 A.L. R.Fed. 544, 565 (1973).

**1230**

The record clearly shows that Simplex performed tasks incidental to cable loading. Such incidental operations do not transform Simplex into an owner *pro hac vice.* *Bossard v. Port Allen Marine Service, Inc., supra; Hess v. Port Allen Marine Service, Inc.,* 624 F.2d 673 (5th Cir.1980). The limited control by Simplex over stowage of cargo or movements of The Huddell does not raise Simplex to the status of owner *pro hac vice.* *See Stephenson,* 598 F.2d at 681; *Fitzgerald,* 451 F.2d at 676; *see also New Orleans-Belize Royal Mail & Central American Steamship Co. v. United States,* 239 U.S. 202, 206, 36 S.Ct. 76, 78, 60 L.Ed. 227 (1915). If the vessel, *pro hac vice,* had been Simplex's vessel, the Navy would not have limited Simplex's possession, command, and navigation of The Huddell. *See Hooe & Co. v. Groverman,* 5 U.S. (1 Cranch.) 134, 147, 2 L.Ed. 86 (1803) (Jay, C.J.).

The Navy did not completely and exclusively relinquish possession, command, and navigation of The Huddell to Simplex. The evidence submitted by the parties presents no genuine issue of material fact. The Court has reviewed all the evidence and has drawn all inferences in the light most favorable to the plaintiff. Nevertheless, Simplex is entitled to judgment in its favor as a matter of law.

Accordingly, the Court herewith rules that:

1. The motions of the United States for summary judgment are denied; and

2. The motion of Simplex for summary judgment on the ground that Simplex was not the owner *pro hac vice* of The Huddell is granted.

SO ORDERED.